Bernard J. GRYSEN and Michael D. Zalsman, Plaintiffs,

v.

Robert J. DYKSTRA, Defendant.

No. G83–61 CA6.

United States District Court, W.D. Michigan, S.D.

June 28, 1984.

McCroskey, Feldman, Cochrane & Brock by Robert O. Chessman, Muskegon, Mich., for plaintiffs.

Scholten, Fant & Marquis by Gregory J. Rappleye, Grand Haven, Mich., for defendant.

## OPINION

HILLMAN, District Judge.

This case raises the issue of the right of the Ottawa County[1] Sheriff, defendant Robert J. Dykstra, to refuse to reappoint two of the Department deputies (Bernard J. Grysen and Michael D. Zalsman) who had run unsuccessfully against Dykstra in the 1980 Republican primary election.[2]

Plaintiffs Grysen and Zalsman claim the refusal of the Sheriff to reappoint them as deputies following the Sheriff's election violated their rights of free speech guaranteed by the first amendment to the United States Constitution.[3] Sheriff Dykstra, on the other hand, claims plaintiffs were not reappointed because their campaign rhetoric criticized him, directly and indirectly, as being ineffective, unqualified and lacking the respect of his deputies. Further, Dykstra maintains that their continued employment in the Department would be distruptive, undermine discipline and adversely affect the Sheriff's working relationship with other employees.

Plaintiff Zalsman was hired as a deputy sheriff of the Ottawa County Sheriff's Department on January 1, 1969. He had a bachelor's degree in public service and a master's degree in public administration from Western Michigan University. He started as a road patrol officer out of the Grand Haven office and later moved to the Coopersville branch office. Zalsman became a command officer in February of 1976. He initially ran the Coopersville office, but was later transferred to take command of the Holland branch office.

Plaintiff Grysen began working for the Ottawa County Sheriff's Department as a deputy sheriff in January of 1973. He had received an associate degree from Grand Rapids Junior College and a Bachelor's Degree in criminal justice from Michigan State University, where he had worked for the Ingham County Sheriff's Department. He, too, was first assigned to road patrol. After a short tour of duty with the marine branch of the Ottawa County Sheriff's Department, Grysen competed for and successfully obtained the position of Branch Commander at the Jenison branch of the Sheriff's Department.

Defendant Robert Dykstra was a member of the Holland Police Department for two years, 1960–1962. He was hired by the Ottawa County Sheriff's Department in 1962 and promoted to rank of Sergeant of Communications. He served as Chief of Police in Hudsonville, Michigan, for six and a half years. He was appointed Ottawa County Sheriff in April 1979, won the Republican primary election in August 1980 and was elected sheriff in November 1980.

During the relevant time period, the Ottawa County Sheriff's Department had the following ranks: sheriff, undersheriff, sergeant, corporal and deputy. Both officers Grysen and Zalsman had been promoted to corporal and were working as branch command officers in Jenison and Holland, respectively.

In 1979, the elected Ottawa County Sheriff resigned to take a position in Lansing,

---

**1.** Ottawa County, Michigan, is located due west of Grand Rapids and borders Lake Michigan. Grand Haven, the county seat, Holland and Hudsonville are its principal towns.

**2.** Under Michigan law deputy sheriffs serve at the pleasure of the sheriff, "and [he] may revoke those appointments at any time." M.C.L.A. § 51.70; M.S.A. § 5.863.

**3.** The fact the deputies were terminated by a "failure to rehire" rather than a "dismissal" is irrelevant to the question of whether they were impermissibly terminated for expressing first amendment rights. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

Michigan. Under Michigan law, when a vacancy occurs in the office of sheriff, the prosecuting attorney, county clerk and judge of probate appoint a temporary successor until the next general election. M.S.A. § 6.715. Deputies Grysen and Zalsman submitted their names, as did Robert Dykstra, who at the time was police chief of Hudsonville, Michigan. Grysen, Zalsman and Dykstra were among the "finalists." The appointment went to Dykstra. Upon his assumption of duties as acting sheriff, Dykstra swore in his deputies, including Grysen and Zalsman.

The following year (1980) was an election year. Dykstra, Grysen and Zalsman all stood for election to the office of sheriff for Ottawa County in the Republican primary. Nomination in the Republican primary in Ottawa County is tantamount to election. Dykstra won in a "landslide" and went on easily to win the general election in November of 1980.

Meanwhile, on August 8, 1980, following their loss in the August 5 primary, plaintiffs were separately called into Sheriff Dykstra's office. What specifically was said in those meetings is in dispute. But, it is not disputed that the Sheriff asked each of them to resign. Initially, each of the deputies agreed, but within a few days, both Grysen and Zalsman notified the Sheriff that they were revoking their verbal resignation. On August 12, 1980, Michael Zalsman wrote Sheriff Dykstra a letter withdrawing his resignation. Bernard Grysen wrote a similar letter on August 18, 1980, stating in part:

> "I would reiterate my suggestion of the 8th when I offered to do what I could to help the administration reunite the department and to move ahead with our service to the people of Ottawa County."

Both officers Zalsman and Grysen continued to work for the Ottawa County Sheriff's Department through the end of 1980. However, on December 5, 1980, Sheriff Dykstra sent letters to both Grysen and Zalsman notifying them that they would not be reappointed to their positions with the Sheriff's Department. The letters stated that Grysen and Zalsman would not be reappointed "due to the overt conflict between you and the administration," and that "this action is necessary and that it will better the department as a whole." They were further advised that December 31, 1980, would be their last day of employment with the Department. Neither officer was, in fact, reappointed. Their employment was terminated as of December 31, 1980.

Plaintiffs filed grievances over their non-reappointment under their collective bargaining contract. They were unsuccessful. It is not disputed that the arbitrator's decision upholding the non-appointment under the Sheriff's Act, M.C.L.A. § 51.70; M.S.A. § 5.863, in no way bars this court's obligation to decide whether plaintiffs' rights under the first amendment were violated by their non-reappointment.

Plaintiffs filed suit on January 27, 1983, invoking jurisdiction under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. The case was tried to the court commencing May 3, 1984, and concluding on May 8. Each plaintiff testified, as did defendant Dykstra. In addition, the undersheriff, Philip Alderink, and Robert Oosterbaan, County personnel director, also testified. The parties submitted post-trial briefs on May 18, June 1, and June 2, 1984. The following are the court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

The legal principles involved in this case are not in serious dispute. Each side in support of its position calls the court's attention to *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Pickering*, the Supreme Court reversed a decision of the Supreme Court of Illinois upholding a decision of a Board of Education in Illinois to dismiss a teacher for opinions he expressed in a letter published in a local newspaper just prior to a millage election. The Board supported the millage; the teacher did not. The letter criticized the Board's allocation of school funds between educational and athletic programs and also challenged the Board's and superintendent's method of in-

forming the taxpayers of the real reason why additional tax revenues were being sought. The Board, in dismissing Pickering, determined that many of his statements in the letter were false. Further, according to the Board, publication of the letter was detrimental to the efficient operation and administration of the schools of the district.

The Supreme Court reinstated Pickering and enunciated a "balancing test" requiring a case-by-case weighing of the interests of the public employee as a citizen, in commenting upon matters of public concern against the legitimate and important interest of the state, as the employer, in promoting employee efficiency in public service.

■■■ What are the "interests" to be balanced? The plaintiffs, in running for the office of sheriff, provided a forum for public debate on matters of public interest and concern. As stated in *Connick v. Myers,* 461 U.S. 138, —— – ——, 103 S.Ct. 1684, 1697–1698, 75 L.Ed.2d 708, 729 (1983), Brennan, J., dissenting:

" '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964). 'The maintenance of the opportunity for free political discussion to the end that the government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, [536], 75 L.Ed. 1117 (1931).

We have long recognized that one of the central purposes of the First Amendment's guarantee of freedom of expression is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government. *Mills v. Alabama,* 384 U.S. [214], at 218–219, 86 S.Ct. [1434], at 1436–1437 [16 L.Ed.2d 484 (1966)]; *New York Times Co. v.*

*Sullivan,* 376 U.S. 254, 269–270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). See A. Mieklejohn, Free Speech and Its Relation to Self-Government 22–27 (1948). 'No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny.' *Saxbe v. Washington Post Co.,* 417 U.S. 843, 862, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting).

Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government.

'Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes.' *Mills v. Alabama, supra* [384 U.S.], at 218–219, 86 S.Ct. at 1436–1437 (emphasis added)."

Opposed to these valuable first amendment rights afforded public employees is the government's legitimate interest in the effective and efficient fulfillment of its responsibilities to the public. In *Connick,* 103 S.Ct. at 1692, Justice White, speaking for the majority said:

"One hundred years ago, the Court noted the government's legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service.' (Citations omitted.)

'To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so

with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.' "

See *also Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734:

"At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

■ In applying the factors set out in *Pickering*, the following considerations become pertinent to this court's "balancing": (1) What in fact did plaintiffs say or charge in their campaign? What effect would these charges have on plaintiffs' continued working relationship with their superiors within the department? Was the speech of such a nature that it would impede the deputies thereafter in the performance of their duties? Were the campaign statements made by plaintiffs directed towards any person with whom they would normally be in contact in the course of their daily work; (2) whether the speech might thereafter adversely affect the ability of immediate superiors to handle discipline in a situation "where a close working relationship requires personal loyalty and confidence";

(3) whether there was any harm or adverse impact on the ordinary operations in the public service performed by the Sheriff's Department; and (4) whether the ability of the public employer to maintain discipline and harmony among co-workers was harmed by the deputies' public criticism. In addition, the balancing must also consider the degree to which the employees' expressions involved matters of public concern and the quality of that concern; the time, place, nature, motive and manner of the expressions. *See McBee v. Jim Hogg County, Texas*, 730 F.2d 1009 (5th Cir. 1984).

■ Initially, the evidence established that all of the speech plaintiffs claim is protected addressed matters of public concern made during an election campaign. In other words, the comments, opinions and expressions by plaintiffs were related entirely to their employment. Because plaintiffs' speech addressed matters of public concern and contributed to their discharge, the burden is on the defendant to justify that discharge. *Connick v. Myers*, 103 S.Ct. at 1691.

As noted above, the two plaintiffs ran for the office of sheriff against the defendant, who had held the job by appointment for less than one year. The comments by plaintiffs, which Dykstra alleges made their continued employment in his department untenable, were contained in political advertisements run by plaintiff Grysen in the local newspaper and also in a "position paper" in which all three candidates (Dykstra, Grysen and Zalsman) responded to a series of questions put to them by one of the leading newspapers in the county.[4]

---

**4.** The *Advance* quoted Grysen as follows:

"The structure of the department is similar to that of 15 years ago, which is no longer the most efficient means to run the department's increasing and changing demands."

In a paid ad also run in the *Advance,* Grysen said:

". . . What do people look for when they vote for a sheriff? If you think that 20 years of police experience as a patrolman or even several years as the chief of police of a small one man police department is adequate preparation to be the head of a 2 million dollar plus,

84 person department, you are sadly mistaken. The day to day tasks of the sheriff department of that size are as far removed from what people normally consider police work as the manager of a G.M. stamping plant from the employee running a stamp press."

The ad pointed out that he (Grysen) was the only candidate with a college degree in police administration. Also, that Grysen had more years of experience in the command level of the Ottawa County Sheriff's Department than any of

Their answers, published verbatim, along with their pictures, were run side-by-side in a special feature of that newspaper entitled "Sheriff Candidates Speak Their Minds." Defendant claims, by implication at least, a reader of the material would believe that defendant Dykstra had inadequate preparation to become sheriff; that Dykstra's running of the Sheriff's Department was analogous to a stamping press employee running General Motors; that Dykstra focused too much time on the jail instead of the road patrol; that Dykstra had difficulty controlling his deputies; that Grysen, in publicizing that a number of deputies were supporting him implied that Dykstra did not have the respect of his deputies. In addition, in the position statement Zalsman stated: "The Ottawa County Sheriff's Department spends millions of dollars in attempts to control the rapidly increasing crime rate, with little success." An implication at least, says defendant Dykstra, that he had failed to control crime. Zalsman's position paper also criticized Sheriff Dykstra for not pursuing grants or distributing procedural manuals to the deputies. Zalsman also wrote that the Sheriff's Department was decentralized and that stricter control by the supervisors was necessary. Zalsman testified that the Sheriff's Department needed to be reorganized to encourage teamwork and to unify work fields. On cross-examination, Zalsman explained that he meant the Sheriff's Department was not unified, and that unity is important in a Sheriff's Department.

First of all, by any standard, the criticism of the Sheriff and his department in the advertisements was mild for a political campaign and void of any vitriolic, personal attacks upon the Sheriff. I can find nothing in any of the writings that could be considered sufficiently hostile, reckless, abusive or insubordinate as to disrupt significantly the continued operation of the office. *Connick*, 103 S.Ct. at 1693. A campaign for public office involves a choice among candidates. The public is asked to select one over another. A campaign by its very nature is designed to educate the public as well as to expose the strengths and weaknesses of the candidates. Certainly, one cannot expect a candidate to offer himself to the public as the second best candidate! If not directly, at least by implication, every political candidate is saying that he can do the job better than his opponent. This hardly constitutes disloyalty or insubordination. As stated in *McBee*, 730 F.2d at 1017:

"Nor need the character of the expression be ignored: the Constitution has not

---

the candidates. The ad concluded with the following question:

"Has the [acting sheriff] demonstrated the ability to earn the professional respect of his subordinates and peers in his present position?"

In the question and answer interviews run in the *Grand Haven Tribune*, Grysen was quoted as saying:

"Given the present situation and the great demands made on any person holding that position I feel that I am the only candidate that has shown the ability to do the job."

Grysen then went on to say that the Sheriff's Department needed to be reorganized:

"The present administration seems to have focused its attention almost solely on the problems of the jail ... equal attention should be given to the needs of some 90,000 of the county's 146,000 people who rely on the sheriff's road patrol for their police protection."

In the same article, plaintiff Zalsman is quoted as saying:

"The Ottawa County Sheriff's Department spends millions of dollars in attempts to control the rapidly increasing crime rate, with little success."

On August 2, 1980, Grysen ran a full-page ad in the *Holland Sentinel* listing a large number of names of individuals in the county who had indicated their support for him. In a small box, also in the same ad, appeared the following:

"The strongest asset of the Ottawa County Sheriff Department has been, and is, its personnel. They were selected not only because of their talents, but because of their strong motivation to be of service to the public. They more so than anyone, know how important proper leadership and support is in their effort to provide the type of service that they as well as the public can be proud of.

The significance of their unprecedented decision to endorse a candidate should not be lost on you the voter.

After meeting with all three candidates, the membership of the Ottawa County Deputy Sheriff's Association voted by a 4 to 1 margin to publicly support Bernard J. Grysen as their choice for Sheriff of Ottawa County.

Respect Must Be Earned to be Given."

repealed human nature; and it is one thing to work with a subordinate who has expressed a reasoned preference for another superior and quite another to have forced on one's organization an individual who has blackguarded one's honesty and ability up and down the county."

The speech at issue in this case relates almost exclusively to criticism of the organization of the Sheriff's Department. Evidence introduced at trial revealed that there had been criticism of the department for a long period of time, predating Sheriff Dykstra's tenure. In fact, reorganization of the Sheriff's Department was also one of Dykstra's major campaign pledges.[5] It should be remembered that Dykstra had been appointed to the job, and had held it for less than a year when he entered the primary. Consequently, criticism of the Department's organization, to a large extent, covered a period prior to Dykstra's appointment.

It is difficult to think of a county office which is of more interest or of more importance to the public than the Sheriff's Department. Who can better advise the public of a Sheriff's Department's strengths and weaknesses than those who are functioning within it? How else can the public make an intelligent decision unless the problems within the Department are publicly exposed?

In *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), the Supreme Court stated that the first amendment expresses

"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

The critical comments directed against Dykstra were, for the most part, indirect (if the Sheriff's Department is in need of reorganization, then presumably the Sheriff is a poor organizer) rather than direct, frontal attacks on the Sheriff himself. The few direct statements about the Sheriff were fair comment. Certainly a claim of inadequate training for the job and failure to obtain a college degree was fair criticism. Whether the Sheriff focused enough time and resources on one problem rather than another, or whether he obtained all federal or state grants available, or failed to distribute handbooks to his deputies, again is legitimate, constructive criticism. Those are matters of utmost interest and concern to the public. Debates over just such issues are clearly what the Supreme Court had in mind in its comments, quoted *supra* at 289 from *New York Times v. Sullivan.*

One of the plaintiffs in a paid ad informed the voters that the Deputies Association had voted to support him, rather than the incumbent.[6] Endorsements are one of the most common forms of political advertisements. Is such an ad, as defendant claims, a charge that the sheriff does not

---

**5.** In the question and answer interviews run in the *Grand Haven Tribune,* Dykstra was asked the following question and gave the following answer:

Question:

"WHAT CHANGES DO YOU THINK SHOULD BE MADE IN THE OPERATIONS OR PHILOSOPHY OF THE OTTAWA COUNTY SHERIFF'S DEPARTMENT?"

Answer:

"A: The rank structure of the Ottawa County Sheriff's Department has been weak for a number of years in comparison to most law enforcement agencies. To correct this weakness, I have been formulating for the past year a rank restructuring program which I feel will meet the needs of the sheriff's department and improve the services to the people of Ottawa County. Plans for implementation of this program are underway and, if approved, would become effective with the 1981 budget."

"B: It is important that the department continue my efforts to cooperate with all law enforcement agencies to avoid duplication of services and that we work together as we have since I was appointed sheriff."

**6.** This endorsement was the result of a meeting held by the deputies where each candidate was invited to attend and present his views. There was no evidence that this meeting was instigated by either plaintiff, nor that either explicitly sought such an endorsement. All three candidates were invited and all attended.

have the loyalty of his deputies? I don't think that follows. One can be a loyal, devoted, trustworthy deputy and still believe that someone else would make a better sheriff. If, in fact, any of the deputies that supported Grysen demonstrated any acts of disloyalty to the Sheriff during or after the election campaign, no such evidence was introduced. The Sheriff himself made no such claim.

Likewise, no claim has been made that any of the ads were blatantly false as in *Pickering*. The Sheriff on the stand denied that there were state or federal funds that could be tapped and he took issue with Grysen on that point. He also disputed that he failed to distribute handbooks. Regardless of which candidate was correct on these issues, it is impossible to read into that ad, or any of the other ads, personal attacks upon the character or integrity of the Sheriff of such a nature that it would create, or even be likely to create, a permanent rupture between him and the plaintiffs.

No evidence was offered to show that during or subsequent to the campaign the Sheriff was in any way angry, humiliated or embarrassed over the publicity. He did express concern about "their ability to support the goals of this administration and my leadership," but this was a subjective expression made within days following the primary and not based on any objective facts or a trial period of employment. Following the primary, and at the meeting between the Sheriff and the deputies, there was testimony that the Sheriff told the deputies that the people of Ottawa County had indicated who they wanted to be sheriff and that he did not feel that they could work together. Although this may have been his legitimate opinion at the time, there is no evidence that that opinion in fact was substantiated. The evidence fails to support the Sheriff's current position that the content of the ads and the statements in the position papers by plaintiffs in any way adversely affected his ability to maintain discipline and harmony, or that the campaign run by the deputies in any way affected the morale within the Depart-ment. If, in fact, that was true, the Sheriff has failed to prove it.

There can be no question that there had been a serious morale problem in the Sheriff's Department before Sheriff Dykstra was appointed, and that the problem continued for some time thereafter. It is not surprising that when a long-term sheriff resigns and an outsider is appointed, rather than one of the deputies within the Department, a morale problem would exist. The undersheriff who testified directly to this point stated that morale was at an all-time low in June of 1979, shortly after Sheriff Dykstra assumed office, which was 10 or 11 months before plaintiffs Grysen and Zalsman announced their candidacy for sheriff. In any event, a bald conclusory statement that "morale" was bad or good at any given time is, without supporting facts, a meaningless conclusion. Morale can be tested by such objective facts as performance, willingness to perform assigned tasks, confidence, cheerfulness and discipline. No evidence was offered to show that there was a decline in any of these categories by any of the deputies as a result of anything that plaintiffs said or wrote about the Sheriff, or the Sheriff's Department, during the primary election of 1980. In addition, it should be noted that plaintiffs continued in their jobs from the date of the election (August 5) to December 31, 1980. No evidence was submitted to prove that, during this four-month period, plaintiffs failed in any way to carry out their usual duties. Likewise, there was no evidence to establish that plaintiffs tried, either directly or indirectly, to undermine confidence or loyalty in the now, newly-elected sheriff. In fact, the evidence is entirely to the contrary. Both plaintiffs worked hard, obeyed every order given, and demonstrated complete loyalty. The fact that each man may secretly have harbored unspoken thoughts that the best man didn't get elected is hardly a basis for concluding that either was disloyal.

The criticism referred to in *Pickering* must not only be of such character as to raise a serious question of whether the

parties could continue to effectively work together, but the comments must be directed at a person "with whom [plaintiffs] would normally be in contact in the course of their daily work as [deputies]" so that it could adversely affect discipline or harmony. As previously noted, no evidence was offered to demonstrate that Sheriff Dykstra was adversely affected by anything said or written by either plaintiff. The public was obviously unimpressed. Sheriff Dykstra won the election in a walk-away! Nor does the evidence support a finding that anything said or written by plaintiffs in any way affected discipline or harmony within the department. In addition, the Sheriff was not in fact plaintiffs' "immediate superior." The day-to-day operation of the Department and the supervision of the deputies was handled by the undersheriff, not Sheriff Dykstra. The Sheriff's Department in Ottawa County is decentralized, and the plaintiffs were stationed in towns other than Grand Haven, the county seat, which was the home base for the Sheriff. In fact, it is clear from both Deputy Grysen's and Sheriff Dykstra's testimony that, given the structure of the Department, they did not really see much of each other in their respective positions. Dykstra testified in deposition:

"Again, they were not really assigned to Grand Haven. I didn't see that much of them. And we never had an opportunity to sit down on a one to one and discuss it."

Likewise, Grysen on the same subject stated:

"I didn't have much personal contact with Bob [Dykstra]. I didn't. I rarely saw him. The meetings that we had, the department meetings, were chaired by the undersheriff and Sheriff Dykstra was not normally in attendance."

At trial, Sheriff Dykstra testified that the undersheriff would have much more contact with officers in the positions such as those held by Grysen and Zalsman. The Sheriff, on the other hand, would attend command meetings with the undersheriff and the lieutenants. The "close working relationship," a requirement set forth in *Pickering,* existed in this case between the deputies and the undersheriff, *not* the deputies and the sheriff. As a consequence, it is not surprising that there was no conflict within the Ottawa County Sheriff's Department as a result of this primary election campaign. Nor is it surprising that the daily duties of the Ottawa County Sheriff's Department's employees were in no way adversely affected by the campaign.

The record is void of any testimony that the Sheriff, or the Undersheriff, had any difficulty maintaining discipline or harmony among the Department employees as a result of anything said or written by plaintiffs during the campaign.

No one denies the importance of loyalty and confidence of employees at all levels in any enterprise, particularly, a sheriff's department. Nor can one quarrel with a rule that permits discharge of an employee who displays a lack of loyalty or confidence, whether in the exercise of first amendment rights or not. But, loyalty, like morale, is a conclusory state of mind subject to objective analysis. Is one, for example, steadfast, constant, faithful, dependable, reliable, trustworthy? If not, then perhaps one could legitimately claim he is not loyal. In this record, however, not one shred of evidence was offered that either plaintiff demonstrated any lack of loyalty to Sheriff Dykstra. The Sheriff himself, on the stand, was not able to point to a single episode or event that could, by anyone's definition, be categorized as disloyalty on the part of the plaintiffs.

In summary, the speech at issue involved matters of considerable public concern made during a public election. No claim is made that plaintiffs shirked their duties by participating in the campaign. The time, place and manner of the speech is not contested. Once the election was over, plaintiffs returned to their duties. No objective factual evidence was offered to demonstrate that anything said by plaintiffs in the campaign constituted a threat to discipline by plaintiffs' supervisors or had any

adverse effect on plaintiffs' performance or on the operation of the Department.

I am satisfied the only reason for the discharge of plaintiffs was retaliation for their having exercised their constitutional right in running for public office. In fact, the Sheriff admitted as much during the trial. This was consistent with his deposition testimony, when he testified as follows:

"Q  If they [plaintiffs] hadn't run in the primary, though, they would have been reappointed?

A  Possibly, probably."

Defendant argues that Grysen and Zalsman created dissension in the Ottawa County Sheriff's Department and undermined the Sheriff's authority. No evidence was offered by the Sheriff to support that conclusion. I am satisfied this argument is an afterthought to justify the non-appointments.

Sheriff Dykstra was unable to identify a single insubordinate act by either plaintiff. Nor has he been able to identify one order during or subsequent to the campaign that was not carried out by either of the plaintiffs. Likewise, no credible evidence was offered of a lack of discipline, or ability to maintain harmony among employees within the Department subsequent to the campaign that was related, directly or indirectly, to plaintiffs' campaign statements.

■ No claim is made by defendant that plaintiffs were not able and competent deputies. As defendant told the press, "It was not a question of whether these two men were doing their job—it was whether they would actively support this administration, its policies and its leader." (D.Ex. 21). Consequently, the evidence overwhelmingly supports the conclusion that the exercise of free speech by both plaintiffs was the significant basis for their discharge. Having reviewed the evidence and "balanced" the factors dictated by *Pickering*, I find the failure of the defendant Dykstra to reappoint plaintiffs constituted a violation of plaintiffs' rights of free speech guaranteed by the first amendment, for which defendant is liable.

## DAMAGES

■ In Civil Rights Act cases, damages may include out-of-pocket pecuniary loss and compensation for emotional and mental stress caused by the intentional tort. As stated in *Morrow v. Igleburger*, 584 F.2d 767, 769 (6th Cir.1978):

"The purpose of damage for deprivation of civil rights is to compensate persons for injuries caused by the deprivation... Once a violation of civil rights is found, a plaintiff may recover for out-of-pocket expenses and emotional distress, but there must be sufficient evidence to support such a finding."

[Citations omitted.] The evidence in this case demonstrates that as a result of the action taken by Dykstra in 1981, Grysen had a wage loss of $11,681. In 1982 and subsequent years, in a new job, his income exceeded what he would have earned as a deputy sheriff in the Ottawa County Sheriff's Department. Consequently, he is awarded $11,681, representing his out-of-pocket pecuniary loss. In addition, I find that he was a conscientious, dedicated officer who enjoyed his work. The loss of his job caused him anxiety and distress. He also suffered an emotional loss in that he has been unable to find employment in his chosen work. Consequently, Grysen is awarded $5,000 to compensate him for emotional distress.

■ Plaintiff Zalsman submitted evidence of wage loss for the years 1980 through 1984. I find that $32,743 reasonably compensates him for his out-of-pocket loss. This award is based on a computation of the base salary he would have earned had he continued with the Sheriff's Department, plus $1,000 in overtime compensation for each of the years in question, less his actual earnings for each of those years. Zalsman submitted evidence that, although he had earned $4,755 in overtime during

1980, his average overtime compensation during his employment with the Sheriff's Department was $2,000 per year. Zalsman was in charge of assigning overtime within his branch. There was testimony that Zalsman at times over-assigned overtime to himself at the expense of the overtime available to the deputies under him. The organization of the Sheriff's Department was also changed following the election in 1980. It was not clear from the evidence at trial whether Zalsman could have expected his overtime to continue at the prior average rate. Accordingly, I find that $1,000 a year is a reasonable estimate of the overtime compensation that Zalsman would have earned had he remained a deputy sheriff. I also find Zalsman entitled to compensation for emotional distress over the loss of his job. He, too, was a dedicated officer with a great deal of investment in his work. Like Grysen, loss of his job caused Zalsman anxiety and distress. He has yet to find re-employment in his chosen field. In fact, Zalsman has experienced greater stress and anxiety than Grysen in that he has yet to find employment where his salary approximates what he was earning as a deputy. Consequently, Zalsman is awarded $10,000 to compensate him for emotional distress.

Both plaintiffs sought additional damages to compensate for loss of their certification to do police work. Grysen testified that recertification is possible. There was no evidence regarding how difficult the recertification process is, nor whether its loss has had or could be expected to have, an actual adverse impact on plaintiffs' re-employment opportunities. Therefore, I find that compensation for plaintiffs' loss of certification would be speculative and award no damages for that aspect of plaintiffs' claims.

Accordingly, plaintiff Grysen is awarded Sixteen Thousand Six Hundred Eighty-one ($16,681.00) Dollars, and plaintiff Zalsman is awarded Forty-two Thousand Seven Hundred Forty-three ($42,743.00) Dollars.