813 F.2d 824
 43 Fair Empl.Prac.Cas. 507,
42 Empl. Prac. Dec. P 36,869, 7 Fed.R.Serv.3d 549,
22 Fed. R. Evid. Serv. 948
 Debra WEBB, Plaintiff-Appellee,
v.
CITY OF CHESTER, ILLINOIS, the Board of Fire and Police
Commissioners of Chester, Illinois, and City of
Chester Police Department, Defendants- Appellants.
 No. 86-2946.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 19, 1986.*
Decided March 6, 1987.
As Amended March 17, 1987.
 
 Stephen W. Thomson, Reed Armstrong Gorman & Coffey, Edwardsville, Ill., for defendants-appellants.
 Marilyn Sue Sachtleben, Runge & Gumbel, P.C., Collinsville, Ill., for plaintiff-appellee.
 Before BAUER, Chief Judge, WOOD, Circuit Judge, and CAMPBELL, Senior District Judge.**
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Plaintiff Debra Webb was hired as a police officer in Chester, Illinois, and shortly thereafter she was fired. She subsequently brought a sex discrimination suit under 42 U.S.C. Sec. 1983 (1982) against defendants City of Chester, Illinois, the Board of Fire and Police Commissioners of Chester, Illinois, and the Chester Police Department.[1] At the conclusion of a jury trial, the jury returned a verdict for plaintiff in the amount of $30,000. The district judge entered judgment on the jury's verdict. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 Plaintiff's brief career in law enforcement began in Mattoon, Illinois. She attended Lakeland College there and completed a two-year law enforcement program. As she finished the program in the spring of 1981, plaintiff applied for the position of police officer in Chester, Illinois. Plaintiff was notified that she must take a written examination and appear before the Board of Fire and Police Commissioners (the "Board") for an oral interview. In addition, she would be required to complete a physical examination at the time she was hired. Plaintiff subsequently took the written examination and appeared before the Board for an oral interview. She was scored on the examination and the interview and then ranked with the other applicants for the position. Her combined score placed her fifth on the list of applicants. All four of the applicants ranked ahead of plaintiff, however, either moved away from Chester or accepted other positions. That left plaintiff at the top of the list.
 
 
 3
 Plaintiff was hired by the Board on February 1, 1982. She then enrolled in a six-week training program at the Police Training Academy in Belleville, Illinois. During the training program, which included physical conditioning, plaintiff completed six written examinations and a firearms test. She received no grade below an 82 and several in the 90s. Plaintiff graduated from the Police Training Academy at the end of the six-week program on March 19th.
 
 
 4
 The day following her graduation, plaintiff began working as a police officer in Chester. Over the next two weeks, plaintiff worked twelve shifts. On April 7th, however, two and one-half weeks after graduating from the Police Training Academy, Chief Jack Houglan, the Chester Chief of Police, recommended in writing to the Board that plaintiff be fired. As the basis for this recommendation, Chief Houglan asserted that plaintiff had been "observed of being incapable and physiologically remissed to perform police functions in the City of Chester."
 
 
 5
 Two days after Chief Houglan wrote the recommendation to fire plaintiff, the Board held a meeting. On the basis of the written recommendation, and Chief Houglan's oral description at the meeting of six specific incidents he alleged demonstrated plaintiff's incompetence as a police officer, the Board voted to fire plaintiff. After the meeting, Chief Houglan contacted plaintiff and told her of the Board's decision. Plaintiff then telephoned one of the three Board members, Commissioner Lampkin, and was told by him that the Board did not need to give any reason for firing her because she was a probationary police officer.
 
 
 6
 The Board eventually hired a male to fill plaintiff's position as a police officer. Plaintiff subsequently filed this lawsuit alleging sex discrimination.
 
 II. LEGAL STANDARDS
 
 7
 Defendants raise four issues on this appeal. Defendants first argue the district judge should have granted their motion for a directed verdict or for a judgment notwithstanding the jury's verdict. Second, defendants contend the district judge improperly admitted the testimony of some witnesses and improperly excluded the testimony of others. Third, defendants challenge the district judge's decision to allow plaintiff to amend her complaint in the middle of the trial. And finally, defendants assert the jury's verdict was excessive and thus warrants a new trial or at least a remittitur.
 
 
 8
 In reviewing a district judge's treatment of motions for directed verdicts, or of motions for judgments notwithstanding jury verdicts, our review is de novo. Although we give due deference to the district judge, our review of these motions is a legal determination, not a determination of whether the district judge ruled within some acceptable range of possible rulings. We discuss this standard of review more fully in our analysis of defendants' contentions to follow.
 
 
 9
 We review challenges to amendments of pleadings, on the other hand, under the abuse of discretion standard. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Bohen v. City of East Chicago, 799 F.2d 1180, 1184-85 (7th Cir.1986).
 
 
 10
 We also use the abuse of discretion standard in reviewing a district judge's admissions and exclusions of evidence. United States v. Buishas, 791 F.2d 1310, 1313 (7th Cir.1986); Kelsay v. Consolidated Rail Corp., 749 F.2d 437, 443 (7th Cir.1984); Ellis v. City of Chicago, 667 F.2d 606, 611 (7th Cir.1981).
 
 
 11
 And in reviewing attacks on jury verdicts for a new trial or for a remittitur, our review is again governed by the abuse of discretion standard. In re Innovative Construction Systems, Inc., 793 F.2d 875, 888 (7th Cir.1986) ("It is only appropriate that we demand a particularly persuasive showing of excessiveness when the initial factfinder--the jury--and the judge--who monitored the proceedings--agree that the award is appropriate."); Joan W. v. City of Chicago, 771 F.2d 1020, 1023 (7th Cir.1985).
 
 
 12
 "Under the 'abuse of discretion' standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether any reasonable person could agree with the district court." Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 563 (7th Cir.1984) (emphasis in original). In other words, "if reasonable men could differ as to the propriety of the [district] court's action, no abuse of discretion has been shown." Smith v. Widman Trucking & Excavating, Inc., 627 F.2d 792, 796 (7th Cir.1980).
 
 III. DISCUSSION
 A. Defendants' Dispositive Motion
 
 13
 Defendants contend the district judge improperly denied their motion for a directed verdict or for a judgment notwithstanding the verdict of the jury. We disagree.
 
 
 14
 "In reviewing a district court's grant of a motion for directed verdict [or for judgment notwithstanding the verdict], the standard to be applied by the court of appeals is the same as that applied by the trial court." Panter v. Marshall Field & Co., 646 F.2d 271, 281 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). That standard applied by the district judge, and by us on appeal, is "whether the evidence presented, combined with all the reasonable inferences permissibly drawn therefrom is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." Tice v. Lampert Yards, Inc., 761 F.2d 1210, 1213 (7th Cir.1985); Benson v. Allphin, 786 F.2d 268, 279 (7th Cir.) ("The standard for granting a directed verdict is very generous to the nonmovant."), cert. denied, --- U.S. ----, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). The district judge does not resolve conflicts in testimony or weigh and evaluate the evidence. Those functions are reserved to the factfinder. See, e.g., Continental Casualty Co. v. Howard, 775 F.2d 876, 879 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986).
 
 
 15
 Nevertheless, the district judge is charged with determining whether "the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict, without 'speculation over legally unfounded claims.' " Panter v. Marshall Field & Co., 646 F.2d 271, 281 (7th Cir.) (quoting Brady v. Southern Railway, 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).
 
 
 16
 These legal standards are applied here in the context of a sex discrimination claim brought under 42 U.S.C. Sec. 1983 (1982). A successful section 1983 claim requires plaintiff to prove (1) defendants acted under color of state law, (2) defendants' actions deprived plaintiff of her rights, privileges, or immunities guaranteed by the Constitution, and (3) defendants' conduct proximately caused plaintiff's deprivation. Coleman v. Frantz, 754 F.2d 719, 722, 725 (7th Cir.1985); Crowder v. Lash, 687 F.2d 996, 1002 (7th Cir.1982). Moreover, plaintiff must demonstrate that defendants acted with discriminatory intent. Parker v. Board of School Commissioners, 729 F.2d 524, 528 (7th Cir.1984). Once plaintiff demonstrates these elements, and thereby makes out a prima facie case of sex discrimination, the burden then shifts to defendants to articulate a legitimate nondiscriminatory reason for taking the action alleged by plaintiff to be discriminatory. If defendants do articulate such a reason, the burden shifts back to plaintiff to demonstrate that the proffered reason is merely a pretext for discrimination. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 250, 101 S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973); Griffin v. Board of Regents, 795 F.2d 1281, 1285 (7th Cir.1986).
 
 
 17
 Plaintiff here established the elements necessary to making out a prima facie case of sex discrimination under section 1983.
 
 
 18
 First, plaintiff implicitly assumes, and defendants do not contest, that defendants acted under color of state law. We treat both defendants, the City of Chester and the Board of Fire and Police Commissioners, as municipal bodies. For purposes of section 1983, municipalities are liable for deprivations, under color of state law, of constitutionally protected rights only when municipal officials act "pursuant to official municipal policy of some nature." Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Oklahoma City v. Tuttle, 471 U.S. 808, 817-18, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); Reed v. Village of Shorewood, 704 F.2d 943, 953 (7th Cir.1983) ("The official acts of municipal policymakers are acts of the municipality for purposes of section 1983 liability."). This requirement ensures that municipalities will not be liable under the doctrine of respondeat superior, or other doctrines of vicarious liability, for individual tortious acts of their employees. But although the doctrine of respondeat superior does not apply to section 1983 claims, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986);[2] Malak v. Associated Physicians, Inc., 784 F.2d 277, 283-84 (7th Cir.1986).
 
 
 19
 Thus, the City of Chester's official municipal policy potentially can be gleaned from the single decision, made by the commissioners on the recommendation of Chief Houglan, to fire plaintiff almost immediately after she was hired. We hold this view because of three factors. First, plaintiff was the first female ever hired as a police officer and the first female fired by defendants. Second, the Board believed it was required by state law to hire plaintiff as the top-ranking applicant for the position. And finally, the employment decisions in Chester for police and fire positions are made by the members of the Board, policy-making officials. As a result, we believe that in the circumstances of this case, the single decision to fire plaintiff is sufficient evidence of the City of Chester's official municipal policy to convince us that defendants acted under color of state law.
 
 
 20
 As for the second element of plaintiff's section 1983 claim, defendants' action deprived plaintiff of her right to equal protection of the law by firing plaintiff on the basis of her sex. Plaintiff was entitled to evaluation based on performance without regard to whether she was a male or a female. Plaintiff had completed a police training course with above average grades. She was hired because she had the highest score, combining written and oral scores, among eligible applicants. And when plaintiff was fired, she was replaced by a male.
 
 
 21
 Finally, plaintiff presented evidence showing defendants acted with discriminatory intent. At the time plaintiff was hired by the City of Chester, one of the three members of the Board, Commissioner Thompson, was present in the mayor's office with plaintiff and the mayor. Plaintiff testified that the mayor was about to leave his office to obtain a police officer's badge for plaintiff when Commissioner Thompson said, "[O]h no, no, no." According to plaintiff, the mayor responded, "[W]hy not, she has passed her physical, et cetera...." Plaintiff testified Commissioner Thompson persisted, "I don't think we ought to give her this badge at this time." The mayor countered, "I see no reason not to." At this point in the conversation, plaintiff testified the mayor left his office to get plaintiff's badge. While the mayor was absent from his office, plaintiff testified Commissioner Thompson said to her: "I don't want you here, you have no business being here, you are a woman, and a woman has no business being a police officer." These remarks provide enough evidence of discriminatory intent to support a section 1983 claim. See Van Houdnos v. Evans, 807 F.2d 648, 652 (7th Cir.1986) (holding defendant's remarks that he desired to "discourage women from applying for the position because he wanted to hire a man for that position" and that plaintiff "need not apply for it because they were going to hire a man for that position" sufficient evidence of discriminatory intent to support prima facie case of sex discrimination under section 1983).
 
 
 22
 To be sure, defendants presented evidence tending to show plaintiff had no section 1983 claim. But at this stage of the trial the district judge appropriately declined to evaluate the evidence or weigh the credibility of the witnesses; instead, he drew the inferences in favor of plaintiff's position and correctly held that plaintiff had established a prima facie case of sex discrimination under section 1983.
 
 
 23
 Once plaintiff established her prima facie case, defendants then had the burden of demonstrating a legitimate nondiscriminatory reason for firing plaintiff so shortly after she was hired. Defendants contend this legitimate nondiscriminatory reason was plaintiff's incompetence in performing her duties during the two weeks she worked as a police officer. In showing this alleged incompetence, defendants point to six incidents in which plaintiff allegedly failed to competently discharge her responsibilities.
 
 
 24
 The first incident occurred the second day plaintiff was on the job. Plaintiff observed a black pickup truck speeding and then rolling through a stop sign. The truck then proceeded to a toll booth at the entrance of a bridge in Chester that spans the Mississippi River from Illinois to Missouri. The truck stopped at the toll booth and then continued across the bridge. Plaintiff pursued the truck into Missouri where she stopped the truck and radioed for assistance. Defendants contend plaintiff should have learned at the Police Training Academy that pursuing a vehicle across state lines is improper, unless the driver of the vehicle has committed a felony. Defendants point out that speeding and rolling through a stop sign are not felonies and that plaintiff was not justified in pursuing the truck into Missouri.
 
 
 25
 The second and third incidents occurred five days later. Chief Houglan was accompanying two officers from the Randolph County Sheriff's Office on a nighttime drug surveillance operation in Chester. While these three officers were seated in an unmarked automobile, parked near a trailer they were observing, plaintiff drove past them and made a traffic stop of another automobile. Plaintiff pulled over and illuminated the interior of her automobile by turning on the dome light. The other driver got out of his car and walked back to plaintiff's automobile. Defendants claim plaintiff violated police procedure, and created a dangerous situation, by allowing the driver of the other automobile to get out and approach a seated police officer, rather than the police officer approaching the stopped automobile.
 
 
 26
 Later that same evening Chief Houglan and the other two officers were driving in the unmarked automobile with beer cans on the dashboard for cover. These officers spotted plaintiff in a parking lot and deliberately drove their automobile over the center line to test plaintiff's reaction. From her position in the parking lot, plaintiff observed the automobile as it passed her by and, unaware of the identities of the automobile's occupants, she followed it. Plaintiff activated her automobile's red lights to pull over the unmarked automobile. Rather than pulling over, however, the three officers turned onto a side street and drove to the rear of an unlighted church parking lot. Plaintiff radioed for a backup. But instead of waiting for the backup to arrive, defendants argue plaintiff violated police procedure by leaving her automobile and approaching the unmarked automobile in the dark. Defendants also argue that plaintiff exacerbated this already dangerous situation by failing to radio the police dispatcher for a check on the license plate number of the stopped automobile before taking any action.
 
 
 27
 The fourth incident happened the next day. Plaintiff pulled over an automobile that was traveling erratically. As plaintiff approached the stopped automobile, she could smell alcohol on the driver's breath. Although the driver's window was down as plaintiff approached the automobile, plaintiff failed to prevent the driver from locking the door and rolling up his window. Unsure of what to do next, plaintiff radioed for advice. A Chester police sergeant instructed plaintiff to put the driver in the police car and take him to his home. Plaintiff attempted, but failed, to remove the drunk driver and again radioed for assistance. This time the police sergeant told plaintiff to follow the driver for the remaining one block to his home. Defendants claim that although procedures for handling drunk drivers were covered at the Police Training Academy, plaintiff did not apply them.
 
 
 28
 Six days later, the fifth incident occurred. Plaintiff followed a pickup truck because she observed several people in the cab. As she began to follow the truck, it went through a parking space and drove up onto a curb. Plaintiff activated her police car's red lights and then the siren. Plaintiff then spoke through the public address system and instructed the driver of the pickup truck to pull into an adjoining gasoline station. When the truck was stopped, plaintiff approached it and asked the teenaged driver to get out of the truck and produce some identification. The other four occupants of the truck got out and lined up against the truck. Defendants contend plaintiff violated police procedure by having the five occupants of the pickup truck get out and line up.
 
 
 29
 The final incident happened the following day. As she began her shift, plaintiff was told by another police officer that members of a particular family involved in a domestic dispute might need some assistance. Shortly thereafter, plaintiff was instructed by the police dispatcher to go to the family residence to provide assistance to the mother of the family. Plaintiff picked up two other officers, who had prior experience with the particular family, and then went out to the family residence. Defendants argue plaintiff took far too much time in responding to a serious situation by stopping to pick up other police officers at the outset. Instead, defendants contend, according to police procedure plaintiff should have gone to the residence immediately, assessed the situation, and then radioed for assistance if any was needed.
 
 
 30
 These six incidents then, defendants argue, provide the legitimate nondiscriminatory reason for firing plaintiff--she was fired for incompetence, not because she was female.
 
 
 31
 Having presented this evidence, the burden then shifted from defendants back to plaintiff to show that defendants' proffered legitimate reason for firing her was merely a pretext for defendants' underlying discrimination. Plaintiff did so by presenting evidence of her own. Part of this evidence consisted of expert testimony as to the appropriateness of plaintiff's actions. Another part of the evidence showed that her actions could not provide a basis for a charge of incompetence because other male police officers had acted in similar fashion under similar circumstances without being fired, reprimanded, or otherwise suffering adverse consequences.
 
 
 32
 As for the first incident, pursuing the black pickup truck into Missouri, plaintiff testified another police officer had warned plaintiff that day about a suspect driving a black pickup truck. The suspect was wanted on a charge of battery, which is a felony, and could be armed and dangerous. Plaintiff also presented evidence that the police department had an unwritten policy of pursuing traffic violators into Missouri. Moreover, plaintiff presented direct evidence that other male officers had, on more than one occasion, pursued traffic violators into Missouri without reprimand.
 
 
 33
 The second and third incidents were the traffic stops observed by Chief Houglan. Although conceding that ideally a police officer approaches a stopped vehicle only after the dispatcher has provided information about a license plate number check or the availability of a backup, plaintiff presented evidence that all police officers are confronted with situations in which they are forced to vary from the ideal. Other male police officers testified that, without reprimand, they too had stopped vehicles with several occupants in dark places, without a backup, or had been unable to approach the stopped vehicle before the other driver had first approached them. Moreover, at least one male police officer testified that he was never tested for his reactions in any situation when he was a probationary officer.
 
 
 34
 The fourth incident, involving the drunk driver, purportedly demonstrated that plaintiff failed to follow police procedure as taught at the Police Training Academy. But plaintiff presented evidence that the police department had a practice in effect, approved by the mayor of Chester, that allowed police officers to take drunk drivers home, and let them return for their vehicles the following day, rather than issuing a citation. Although plaintiff admitted this was not the procedure taught at the Police Training Academy, other male police officers testified they understood Chester's policy to differ from the procedure taught at the Police Training Academy and that they had acted in accordance with Chester's policy without suffering any adverse consequences.
 
 
 35
 The fifth incident was plaintiff's stopping the pickup truck full of teenagers. Defendants argue that asking five people to get out of a truck and line up created a dangerous situation. Plaintiff, on the other hand, testified that although she did not radio for a backup, she did notice as she pulled over the pickup truck that a State Trooper and a County Police Officer were parked across the street in separate automobiles. Moreover, she testified that when she approached the pickup truck she could see that the occupants were all teenagers. She also testified she asked only the driver to get out of the pickup truck; the other occupants were laughing about the incident and tumbled out of the truck on their own initiative.
 
 
 36
 The final incident involved the family that was embroiled in a domestic dispute. Defendants argue plaintiff was slow in responding to a call to provide assistance. But plaintiff presented testimony from other male police officers that domestic disputes present particularly dangerous situations when police officers are called for assistance and that when possible more than one police officer should respond to such calls for assistance. In addition, when plaintiff came on duty that day, she was told by another police officer that he had been involved with this particular family's dispute during his own shift. Specifically, the police officer told plaintiff that the father had been at the police station and while there he "was quite belligerent with us."
 
 
 37
 Plaintiff's evidence about these six incidents can be viewed as demonstrating that defendants' proffered reason for firing plaintiff for incompetence was merely a pretext for their underlying discrimination. That is, it tended to show that defendants' actual reason for firing her was that she was female. Rather than weighing the evidence or assessing the credibility of the witnesses at this juncture, the district judge appropriately sent the case to the jury because plaintiff had presented enough evidence to establish a prima facie case and to rebut defendants' proffered reason. We hold, therefore, that the district judge's denial of defendants' dispositive motion was appropriate. See Selle v. Gibb, 741 F.2d 896, 900 (7th Cir.1984) ("Both we and the district court must be reluctant to remove an issue from the purview of the jury on either a directed verdict or a judgment notwithstanding the verdict.").
 
 B. Admission and Exclusion of Evidence
 
 38
 Defendants also contend that the district judge abused his discretion by admitting some testimony favorable to plaintiff, while excluding other testimony favorable to defendants.
 
 
 39
 One of plaintiff's experts, a Mr. William Johnson, was an assistant professor in the law enforcement department of Western Illinois University. He had previously been a training instructor for the Police Training Institute of the University of Illinois and a police officer in Chicago. As an expert, he testified as to the appropriateness of plaintiff's actions in each of the six incidents. At trial, defendants challenged his right to do so. They argue now, as they did at trial, that plaintiff was a probationary employee. Because she was a probationary employee, defendants contend her competence in performing her job is irrelevant to her firing: "[A]s long as she is probationary, [defendants'] firing could be unwarranted and unjustified as long as it wasn't unconstitutional...." Any testimony Mr. Johnson presented as to the appropriateness of plaintiff's actions, defendants argue, bears only on whether her firing was unwarranted or unjustified--not on whether the firing was based on her sex.
 
 
 40
 We disagree. As explained by the district judge in an in-chambers conference at the time plaintiff called Mr. Johnson to the stand:
 
 
 41
 I think this [expert witness's testimony] is admissible because [defendants] have advanced, as a legitimate nondiscriminatory reason for them terminating her employment her performance as a police officer on four or five incidents. They say that her performance was not acceptable to them, and that's why they fired her. You now have the responsibility of showing that the reasons that they have advanced are pretextual. In order to show that those reasons are pretextual, I think you can properly introduce evidence that her performance on those occasions did conform to standards of good police work. By showing that, that the advancement of these reasons by the police department is pretextual.
 
 
 42
 The district judge's explanation was correct and crystal clear. Mr. Johnson's testimony was relevant to the issue of whether or not defendants' proffered explanation for firing plaintiff was merely a pretext for discrimination. Indeed, his testimony was so relevant that if the district judge had excluded it, we might well have held he abused his discretion in so doing. In any event, we agree with the district judge and hold that his admission of Mr. Johnson's testimony was not an abuse of his discretion.
 
 
 43
 Defendants also complain that the district judge abused his discretion by admitting the testimony of two of plaintiff's other witnesses while excluding the testimony of their own witnesses. Defendants attempt to tie together these separate decisions by the district judge with an implicit "law of the case" argument:
 
 
 44
 If previous border crossings and ex-police chief training procedures are relevant, then certainly subsequent acts of incompetence by a party to this lawsuit are relevant. Conversely, if subsequent acts of incompetence by a party to this suit are not relevant, then previous acts by police officers not parties of this suit and an ex-police chief training procedure should likewise be irrelevant.
 
 
 45
 We do not feel constrained, however, to analyze these separate evidentiary decisions by the district judge as a coherent group. Instead, we consider them separately. Cf. Pierce v. Ramsey Winch Co., 753 F.2d 416, 431 (5th Cir.1985) ("We are aware of no rule, however, that the admission of one party's exhibits on a given issue automatically renders admissible all exhibits of the other side that bear on the same issue."); United States v. International Business Machines Corp., 87 F.R.D. 411, 414 (S.D.N.Y.1980) ("[E]ach evidentiary ruling is an exercise of judgment--an interplay of many considerations, such as relevancy, cumulativeness, and probative value, to name but a few, that may vary from ruling to ruling. Even when correctly understood, law of the case does not bind the court to perpetuate or apply an inapposite decision when circumstances are different.").
 
 
 46
 Defendants argue the testimony of Dale Volle, a Chester police officer, should have been excluded. Officer Volle testified about an incident in which he pursued a traffic violator over the bridge from Chester into Missouri without receiving a reprimand. Defendants contend: "Besides the fact that this has no relevance on the issue of whether plaintiff was terminated because of her sex, the incident was so distinguishable from plaintiff's border crossing that it should not have been admitted into evidence." We disagree.
 
 
 47
 We have already discussed defendants' first contention with respect to Officer Volle's testimony. As for defendants' second contention, Officer Volle's testimony showed that a male police officer had pursued a traffic violator into Missouri. Plaintiff also pursued a traffic violator into Missouri. Although any two factual situations can be distinguished to some degree, the distinctions here go to the weight the jury might accord to Officer Volle's testimony about his own experience, and not to its admissibility. We hold the district judge did not abuse his discretion in admitting Officer Volle's testimony.
 
 
 48
 Defendants also complain about the district judge's admitting testimony from Elmer Mier, a former police chief of Chester. Chief Mier testified about the training policies he used when training new police officers in Chester. Defendants argue Chief Mier's training policies have no bearing on plaintiff's firing at Chief Houglan's recommendation because Chief Mier's policies were not in effect at that time. Chief Houglan, however, was hired at the same time plaintiff was hired. He attended the Police Training Academy with plaintiff. When he recommended that plaintiff be fired, plaintiff had only worked twelve shifts over a period of two and one-half weeks. Chief Mier's testimony was relevant in that it tended to show that the new, inexperienced Chief Houglan did not follow normal training procedures, followed by a previous police chief, in training plaintiff. Because Chief Mier's testimony was relevant for that purpose, we hold the district judge did not abuse his discretion in admitting it.
 
 
 49
 Lastly, defendants argue that the district judge improperly excluded testimony about an incident in which plaintiff was involved two years after she was fired as a police officer for Chester. After she left Chester, plaintiff worked as a part-time police officer in Fayetteville, Illinois. She became involved in an incident at a bar. Plaintiff attempted, but failed, to arrest an armed robbery suspect. After eluding plaintiff, the suspect killed a young couple and fled to Colorado before he was apprehended. Defendants argue: "The fact that plaintiff was still incompetent two years later (after two additional years of police work) certainly has a 'tendency' to show that plaintiff was incompetent during her tenure with the City of Chester and that this was the basis of her dismissal." (quoting Fed.R.Evid. 401).
 
 
 50
 The district judge, however, explained why he excluded the evidence: "I think the incident is too far removed from what we're talking about here. It happened some two years after she was discharged...." In a later written order, the district judge also explained that "the subsequent acts would have been too prejudicial."
 
 
 51
 Even if defendants' evidence would have shown the occurrence of an incident that demonstrated plaintiff's incompetence, a presumption hotly disputed by plaintiff on its merits, we cannot say that the district judge abused his discretion in excluding it. The incident occurred two years after plaintiff worked as a police officer for Chester. It happened in a different town under different circumstances. Moreover, the nature of the evidence itself could have aroused the jury's emotions and created a lengthy and distracting factual dispute. Cf. City of Cleveland v. Cleveland Electric Illuminating Co., 538 F.Supp. 1257, 1264 (N.D.Ohio 1980) ("[T]he trial court is fully entitled, in the exercise of its discretion, to exclude evidence of prior and subsequent transactions where the probative value of the same is clearly outweighed by certain legitimate interests of the Court and the opposing party."). Therefore, we hold the district judge did not abuse his discretion in excluding this evidence.
 
 C. Amending the Complaint
 
 52
 Defendants further contend they were unduly prejudiced by the district judge's allowing plaintiff to amend her complaint in the middle of the trial.
 
 
 53
 Plaintiff's original complaint sought injunctive relief and damages for lost wages. It also asked for costs, "including reasonable attorney [fees] and other additional relief as may appear to the Court equitable and just."
 
 
 54
 Three days before the trial began, plaintiff moved to amend her complaint by adding count II, seeking additional damages for "undue anguish, physical symptoms of stress, psychological stress, humiliation, and lost wages," and count III, seeking punitive damages. The district judge denied plaintiff's motion to amend. He severed count II and dismissed count III.
 
 
 55
 The case then went to trial. During the third day of trial, while plaintiff was testifying on the stand, plaintiff's counsel moved to amend plaintiff's complaint for a second time. Plaintiff's proposed second amendment sought damages for "emotional or mental distress, embarrassment and humiliation." Defendants objected to plaintiff's motion to amend because defendants contended it was untimely and because it was in large respect the same amendment plaintiff had proposed only days earlier. The district judge convened a side-bar conference. At the conclusion of the side-bar conference, which eventually became a conference in chambers, the district judge granted plaintiff's motion to amend. Counsel for plaintiff then proceeded to examine plaintiff about her embarrassment and humiliation.
 
 
 56
 Defendants argue they were unduly prejudiced by the district judge's ruling, and plaintiff's subsequent testimony, "because they were denied the opportunity to conduct any discovery on this new factual issue."
 
 
 57
 To some degree, we sympathize with defendants' position. "Although leave to amend should be 'freely given when justice so requires,' considerations of delay and prejudice may preclude automatic grant of an amendment." Bohen v. City of East Chicago, 799 F.2d 1180, 1184 (7th Cir.1986) (quoting Fed.R.Civ.P. 15(a)). Defendants persuasively argue that leave to amend should have been denied because plaintiff's "[d]elay in presenting the amendment ... has caused the opposing party undue prejudice." Textor v. Board of Regents, 711 F.2d 1387, 1391 (7th Cir.1983).
 
 
 58
 Indeed, defendants point out that plaintiff sought to amend her complaint over two years after this lawsuit was initiated and only days before the trial was to begin. Quite some time before plaintiff proposed the amendment, plaintiff answered defendants' interrogatories and had her deposition taken, but did not raise the issue of embarrassment and humiliation. Moreover, plaintiff's counsel participated in a pretrial conference approximately two weeks before trial and announced that plaintiff was ready for trial, but did not discuss the possible claim for embarrassment and humiliation. And finally, the second amendment closely resembled the first amendment, which had been denied only days earlier.
 
 
 59
 However, for two reasons we cannot agree that the district judge abused his discretion in allowing plaintiff's amendment. See Bohen v. City of East Chicago, 799 F.2d 1180, 1185 (7th Cir.1986) ("[S]imply because we may have come to a different conclusion than the trial judge does not mean that the judge abused his discretion.").
 
 
 60
 First, we do not believe that plaintiff's amendment was so untimely that the district judge abused his discretion in allowing it in these particular circumstances, even though he allowed it in the middle of the trial. "A trial judge is particularly well-situated to judge the worthiness of a plaintiff's motion to amend his complaint, having been involved in the progress of the case throughout its development and having viewed first-hand the party's diligence or lack thereof." Id. We defer to the district judge's assessment in this regard. A claim for embarrassment and humiliation is almost inherent in the firing of a public officer, and does not introduce complex, new, or totally extraneous issues. It is, however, a practice we do not encourage.
 
 
 61
 Second, defendants were never denied an opportunity because they never sought the opportunity. Counsel for defendants did not seek a continuance. Neither did counsel voir dire plaintiff with respect to her claims for embarrassment and humiliation and moreover, defendants' counsel did not even cross-examine plaintiff after she testified as to her embarrassment and humiliation.
 
 
 62
 Had defendants requested such opportunities, and the district judge denied them, we might possibly be presented with a different question. But we are not. Defendants here simply failed to take those measures that would have softened the blow of an amendment to a complaint in the middle of a trial. Because they never sought an opportunity to take discovery or to take any other steps to alleviate their concededly difficult situation, defendants were not denied that opportunity. That, coupled with the district judge's greater familiarity with the case and the parties, and his broad discretion in deciding whether or not to allow the amendment, convince us that the district judge did not abuse his discretion in allowing plaintiff's amendment.
 
 D. Excessive Verdict
 
 63
 Finally, defendants argue the jury's verdict is excessive. Because the verdict is excessive, defendants contend they should be granted a new trial or at least have the amount of the judgment remitted.
 
 
 64
 Challenging a jury's verdict is difficult at the level of the district court. It is even more difficult to challenge a jury's verdict on appeal when the district judge has already agreed with the jury. As we recently explained:
 
 
 65
 The test is severe. Trial judges may vacate a jury verdict for excessiveness only if it is "monstrously excessive" or if there is "no rational connection between the evidence on damages and the verdict," Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963, 971 (7th Cir.1983), and appellate review is governed by the extremely limited abuse of discretion standard, see Galard v. Johnson, 504 F.2d 1198, 1199 (7th Cir.1974). Recently, this court added an additional element to the equation where the case under review is but one of a series of similar cases that establish a trend in damage awards: comparability. Levka v. City of Chicago, 748 F.2d 421, 425 (7th Cir.1984) ("One factor we must consider in determining whether to set aside an award is whether the award is out of line compared to other awards in similar cases."); Phillips v. Hunter Trails Community Assoc., 685 F.2d 184, 190 (7th Cir.1982).
 
 
 66
 Joan W. v. City of Chicago, 771 F.2d 1020, 1023 (7th Cir.1985).
 
 
 67
 Thus, our task is to determine whether the district judge abused his discretion in concluding that the jury's verdict was not monstrously excessive and was not out of line when compared to other awards in similar cases. See Galard v. Johnson, 504 F.2d 1198, 1200 (7th Cir.1974) (" 'Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand.' ") (quoting Dagnello v. Long Island Rail Road, 289 F.2d 797, 806 (2d Cir.1961)).
 
 
 68
 We recently made this inquiry in another case involving a section 1983 claim for violation of constitutional rights, which occurred during a scuffle between a policeman and a citizen. Bailey v. Andrews, 811 F.2d 366, 374-77 (7th Cir.1987). In that case we reviewed the amounts of awards in housing discrimination suits and suits arising from police strip searches in Chicago as examples of how allegedly excessive verdicts are analyzed. Id. Using that same analysis here, we are unconvinced that plaintiff's award of $30,000 for sex discrimination is either monstrously excessive or out of line with awards in similar cases. Of the $30,000 awarded to plaintiff, $9,750 represented compensation for lost wages. The other $20,250 represented compensation for embarrassment and humiliation. There is no question that damages may be awarded for embarrassment and humiliation in an action based on violation of constitutional rights. See Carey v. Piphus, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). Our review of other cases in which plaintiffs were fired from their jobs, and then subsequently brought section 1981 and 1983 claims based in part on similar injuries, shows that some awards for embarrassment, humiliation, emotional distress, and the like, were greater than plaintiff's award,[3] and some were less.[4] The awards ranged from a low of $500 to a high of over $50,000.
 
 
 69
 Because the jury's award to plaintiff of $20,250 for embarrassment and humiliation is not monstrously excessive and is not out of line with other awards in similar cases, we hold the district judge did not abuse his discretion in upholding it.
 
 IV. CONCLUSION
 
 70
 In sum, we hold the district judge properly denied defendants' motion for a directed verdict or for judgment notwithstanding the verdict. We also hold the district judge did not abuse his discretion in ruling on the evidentiary issues, the amendment to the pleading issue, or the excessive verdict claim. Therefore, for the foregoing reasons, the judgment of the district court is
 
 
 71
 AFFIRMED.
 
 
 
 *
 This is the second time we have considered this case on appeal. This case was initially appealed, and we then heard oral argument, as No. 86-1090. After hearing oral argument and examining the briefs, however, we concluded we lacked jurisdiction to consider the appeal because we were not presented with a final judgment. The judgment was not final at that time because a severed count from plaintiff's first amended complaint remained available for continued litigation in the district court. Accordingly, we dismissed No. 86-1090 by order dated October 22, 1986. 804 F.2d 144. Plaintiff subsequently moved the district court for voluntary dismissal with prejudice of the severed count. The district judge granted plaintiff's motion by order dated October 29, 1986. Defendants then filed a timely appeal, No. 86-2946, from a then-final judgment. We now decide No. 86-2946 on the basis of the original briefs filed in this case and the oral arguments we heard when those briefs were filed
 
 
 **
 The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 On the day the trial began, defendants moved "to strike the Chester Police Department as a party defendant as it is not a separate entity independent of the city of Chester." The district judge granted the motion, leaving only the City of Chester and the Board of Fire and Police Commissioners as defendants in this case
 
 
 [2]
 The single decision giving rise to municipal liability apparently may be rather insignificant. As noted by the dissenting justices in Pembaur: "This five word response ['go in and get them'] to a single question over the phone is now found by this Court to have created an official county policy for which Hamilton County is liable under section 1983." Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 1305, 89 L.Ed.2d 452 (1986) (Powell, J., dissenting, joined by Burger, C.J., and Rehnquist, J.)
 
 
 [3]
 Muldrew v. Anheuser-Busch, Inc., 728 F.2d 989, 992 & n. 1 (8th Cir.1984) (section 1981 claim based on race discrimination--employee awarded $52,644.80 for "emotional distress and mental suffering" when fired from job); Foster v. MCI Telecommunications, Corp., 555 F.Supp. 330, 337 (D.Colo.1983) (section 1981 claim for race discrimination--employee recovered $50,000 for "embarrassment, humiliation, severe anxiety and great emotional suffering" when fired from job), aff'd, 773 F.2d 1116 (1985); Barnett v. Housing Authority, 707 F.2d 1571, 1578-79 (11th Cir.1983) (section 1983 claim based on violations of due process--city employee awarded $41,000 for "emotional distress" when fired from job); Ramsey v. American Air Filter Co., 772 F.2d 1303, 1313-14 (7th Cir.1985) (section 1981 claim for race discrimination--employee awarded $35,000 for "mental distress" for being subjected to improper lay-off procedures); Grubb v. W.A. Foote Memorial Hospital, Inc., 533 F.Supp. 671, 676 (E.D.Mich.1981) (section 1981 claim based on age and race discrimination--employee recovered $25,000 for "emotional distress" when fired from job), aff'd, 759 F.2d 546 (6th Cir.1985)
 
 
 [4]
 Block v. R.H. Macy & Co., 712 F.2d 1241, 1245 (8th Cir.1983) (section 1981 claim for race discrimination--employee awarded $12,402 for "mental anguish, humiliation, embarrassment and stress" when fired from job); Aumiller v. University of Delaware, 434 F.Supp. 1273, 1310-11 (D.Del.1977) (section 1983 claim based on sexual preference discrimination--university professor recovered $10,000 for "mental distress, humiliation and embarrassment" when teaching contract not renewed); Grysen v. Dykstra, 591 F.Supp. 282, 292-93 (W.D.Mich.1984) (section 1983 action for violation of first amendment rights--two deputy sheriffs awarded $5000 and $10,000 respectively for "emotional distress" when not reappointed to positions); Hayes v. Shelby Memorial Hospital, 546 F.Supp. 259, 267 (N.D.Ala.1982) (section 1983 claim based on discrimination against woman because of her pregnancy--x-ray technician awarded $6000 for "embarrassment, humiliation, and emotional distress" when hospital terminated employment), aff'd, 726 F.2d 1543 (11th Cir.1984); Eckerd v. Indian River School District, 475 F.Supp. 1350, 1366-67 (D.Del.1979) (section 1983 claim based on violation of first amendment rights--music teacher recovered $5000 for "emotional distress and humiliation" when school district fired him); Cerjan v. Fasula, 539 F.Supp. 1226, 1235 (N.D.Ohio 1981) (section 1983 claim based on violation of first amendment rights--police officer awarded $5000 for "emotional distress, humiliation and embarrassment" when chief deputy fired him), aff'd mem., 703 F.2d 559 (6th Cir.1982); Rosemond v. Cooper Industrial Products, 612 F.Supp. 1105, 1118 (N.D.Ind.1985) (section 1981 claim for race discrimination--computer operator recovered $500 for "mental humiliation and emotional harm" when discharged from job)