836 F.2d 346
 David ANDERSON, Plaintiff-Appellant,
v.
Martin GUTSCHENRITTER, individually and as Sheriff of
Sangamon County, Larry Dick, individually and as
Warden of Sangamon County Jail,
Defendants-Appellees.
 No. 86-2092.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 8, 1987.
Decided Jan. 7, 1988.
 
 Mary Lee Leahy, Leahy & Leahy, Springfield, Ill., for plaintiff-appellant.
 Nancy G. Lischer, Sp. Asst. Atty. Gen., Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Springfield, Ill., for defendants-appellees.
 Before WOOD, COFFEY, and RIPPLE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Plaintiff-appellant David Anderson filed a section 1983 suit against Martin Gutschenritter, the Sheriff of Sangamon County, Illinois, Larry Dick, the Sangamon County Jail Warden, and Sangamon County. The district court granted the County's motion for summary judgment and directed a verdict in favor of Gutschenritter and Dick at the close of all evidence. We reverse.
 
 I.
 
 2
 Anderson was charged with attempted murder and armed robbery of a fifteen year-old gas station attendant whose throat he allegedly slashed.[1] Anderson was incarcerated prior to his trial in the Sangamon County Jail in Springfield, Illinois on June 29, 1976. In the first month of his incarceration, Anderson had several conversations with Sheriff Gutschenritter. The first conversation occurred within a week after Anderson entered the jail when a correctional officer escorted Anderson to an interrogation room, saying that the sheriff wanted to see him. Also present in the room was a detective whom Anderson had never seen before.
 
 
 3
 According to Anderson,[2] the sheriff poked him in the face with his finger, and referring to the victim of the crime Anderson was charged with, the sheriff said, "If anything happens to that kid, if he died, I am going to personally cut your throat." Gutschenritter then started moving his arms around in different holding techniques, asking Anderson how he had committed the crime, whether he did it "this way or did he do it that way." Anderson did not respond to any of Gutschenritter's comments. Gutschenritter then said to "get this garbage or trash out of sight" and ordered Anderson to be taken back to his cell.
 
 
 4
 Anderson's second conversation with Gutschenritter took place about a week later when Gutschenritter came back into the cell block. Gutschenritter was talking to a couple of inmates when he spotted Anderson. Gutschenritter told Anderson that he ought to see all the hate mail and phone calls he was getting concerning Anderson. Gutschenritter also said, "You know, people on the street want you dead." Again, Anderson did not respond to these comments.
 
 
 5
 Three or four days later, Gutschenritter was again back in the cell block. When he saw Anderson, he stopped. Gutschenritter repeated that he continued to receive a lot of phone calls and hate mail and said, "They must really want you pretty bad."
 
 
 6
 Thereafter, Anderson sent a note to Dick, the warden of the jail, asking to see him. When Anderson arrived at Dick's office, both Dick and Gutschenritter were there. Anderson told Dick that Gutschenritter had threatened him and asked Dick to see that Gutschenritter left him alone. Anderson also asked Dick to have Gutschenritter stay out of the cell block because Gutschenritter was stirring up trouble.
 
 
 7
 Anderson's next conversation with Gutschenritter occurred on July 17, 1976 in Dick's office after Anderson had once again sent a note to Dick asking to see him. Anderson told Dick and Gutschenritter that he had heard rumors that someone was out to get him, and he asked them to place him in protective custody. Anderson could not identify who was allegedly after him, but he said he took the warning very seriously. Dick and Gutschenritter told Anderson that if he could not give them a name, there was nothing they could do to help him. They then sent Anderson back to his cell and did not investigate the matter further.
 
 
 8
 Two days later, on July 19, 1976, Anderson awoke to find his cell mate, Steven Swearingen, stabbing him. He heard Swearingen say, "I'm going to get you for getting that sixteen year-old kid." Anderson fought Swearingen off, but Swearingen managed to stab Anderson twenty-seven times with a five and a half-inch knife. Another inmate finally called for assistance, and an officer helped Anderson out into the cat walk and applied some first aid. Anderson was taken by ambulance to St. John's Hospital where he was hospitalized for three weeks.
 
 
 9
 The day after the Swearingen attack, Anderson's sixteen year-old sister visited Gutschenritter's office to gain permission to see her brother. Gutschenritter informed her that he could not understand why she wanted to see her brother, saying "if it was my brother, I wouldn't want to have anything to do with him after what he had done." Gutschenritter also told her that "if I had to do it over again, Anderson would have laid there a bit longer because after what he did, he didn't deserve to live, that he should be dead." Later, Gutschenritter visited Anderson in the hospital and said, "You should have died. You would have saved the taxpayers a lot of money."
 
 
 10
 Anderson returned to the jail when he was released from the hospital. He asked to be placed in an individual cell, and Dick granted his request. While Anderson was out of his cell to exercise one day, four other inmates in segregation attacked and beat him after one inmate said, "We got us a killer here. Come and get some." No corrections officer was present when the inmates in segregation were out of their cells during the exercise period.
 
 
 11
 Anderson filed a section 1983 claim in 1981, alleging that his Eighth and Fourteenth Amendment rights had been violated. Specifically, Anderson claimed that the defendants acted deliberately or with callous indifference in failing to protect him from being assaulted. The district court granted the County's motion for summary judgment, reasoning that the sheriff, and not the County, was responsible for the operation of the sheriff's department and that therefore liability under section 1983 for the operation of the sheriff's department could not attach to the County. At the close of the evidence at trial, the district court granted Gutschenritter and Dick's motion for a directed verdict. The court concluded that Anderson's right to be free from cruel and unusual punishment under the Eighth Amendment was not violated because the defendants could not have known of any impending danger posed to Anderson by his cell mate.
 
 II.
 
 12
 "In reviewing a district court's grant of a motion for directed verdict, the standard to be applied by the court of appeals is the same as that applied by the trial court." Panter v. Marshall Field & Co., 646 F.2d 271, 281 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Our review is de novo, and the standard applied by the district judge, and by this court on appeal, is "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." Tice v. Lampert Yards, Inc., 761 F.2d 1210, 1213 (7th Cir.1985). See also Webb v. City of Chester, 813 F.2d 824, 827-28 (7th Cir.1987). The district judge is not to resolve conflicts in testimony or weigh and evaluate the evidence, functions that are reserved to the factfinder. Id. at 828. If the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict, without speculation over legally unfounded claims, the motion should be denied. See, e.g., Panter, 646 F.2d at 281.
 
 
 13
 These legal standards are applied here in the context of Anderson's Eighth and Fourteenth Amendment claims brought under section 1983. The district court clearly erred in relying upon the Eighth Amendment to analyze the claims of Anderson, who was a pretrial detainee. Due process protects the rights of a pretrial detainee not to be punished. The Eighth Amendment right to be free from cruel and unusual punishment is applicable only to those criminals who are serving a sentence. Bailey v. Andrews, 811 F.2d 366, 373 (7th Cir.1987). A sentenced inmate may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment. Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). The Supreme Court recognized this distinction in Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), when it stated:
 
 
 14
 "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."
 
 
 15
 Id. at 671-72 n. 40, 97 S.Ct. at 1412-13. Because there had been no formal adjudication of guilt against Anderson at the time of the incidents in question, the Eighth Amendment has no application. The due process rights of a person in Anderson's situation are at least as great as the Eighth Amendment protections available to a convicted prisoner, see City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), and it is in this light that Anderson's claim must be evaluated.
 
 
 16
 The Due Process Clause "protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted." Matzker v. Herr, 748 F.2d 1142, 1150 (7th Cir.1984). To prevail on a Fourteenth Amendment claim, Anderson had to prove that Gutschenritter and Dick acted deliberately or with callous indifference, evidenced by an actual intent to violate Anderson's rights or reckless disregard for his rights. Shelby County Jail Inmates v. Westlake, 798 F.2d 1085, 1094 (7th Cir.1986). We are convinced that the evidence in this case, taken as a whole, provided a sufficient basis upon which a jury could reasonably reach a verdict in Anderson's favor. Anderson testified that Gutschenritter informed him twice of threats on Anderson's life before he was attacked by Swearingen and that Anderson told Gutschenritter and Dick of rumors that "someone was out to get him." Moreover, this was not simply an amorphous threat because Anderson told Dick that Gutschenritter had been stirring up trouble in the cell block. The jury could have found that Gutschenritter had shown indifference or a willingness to allow the attack by stirring up trouble, by his alleged threats to Anderson, and by his comment to Anderson's sister that he "would have let Anderson lay there a bit longer after the attack by Swearingen if he had it to do over again." The jury could have reasonably inferred from this testimony that Gutschenritter and Dick failed to protect Anderson after learning of a strong likelihood that Anderson would be assaulted, and the district court improperly directed a verdict in Gutschenritter and Dick's favor.
 
 III.
 
 17
 Anderson also challenges the district court's conclusion that the County was entitled to summary judgment. This ruling must be reversed in light of Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), a case decided after the district court granted the County's motion. In Pembaur, the Court held that a county can be held liable under section 1983 for a single decision by municipal policymakers if the decision to adopt a particular course of action is directed by those who establish governmental policy. Id. 106 S.Ct. at 1298-99. Here, Gutschenritter was responsible for running the Sangamon County Jail, and the County does not dispute that the actions of Gutschenritter, as sheriff, are now considered to be the policy of the County under Pembaur. Instead, the County simply states in its brief on appeal, "That judgment should now be affirmed because Pembaur should not be applied retroactively to this case according to the doctrine of Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)." Brief of County at 3. There is no discussion of Chevron or its application to the case at hand. Indeed, this is the totality of the County's "argument."
 
 
 18
 This court has held that "collateral allusions to a legal issue do not require the court to decide difficult questions." Bonds v. Coca Cola Co., 806 F.2d 1324, 1328 (7th Cir.1986). Moreover, even an issue expressly presented for resolution is waived if not developed by argument. Hunter v. Allis-Chalmers, 797 F.2d 1417, 1430 (7th Cir.1986). Because the County does not argue the issue, its brief falls far short of presenting a proper analysis to enable us to rule on the question of applying Pembaur retroactively. The County has "left the argument undeveloped, and there it shall stay." Bonds, 806 F.2d at 1329.
 
 IV.
 
 19
 The decision of the district court to grant Gutschenritter and Dick's motion for a directed verdict and the County's motion for summary judgment is REVERSED, and the case is REMANDED for such additional proceedings as may be appropriate. Circuit Rule 36 shall not apply.
 
 
 
 [1]
 The charge of attempted murder was later changed to murder after the victim died in October 1976
 
 
 [2]
 Because the district court granted Gutschenritter and Dick's motion for a directed verdict, we review the evidence presented, combined with all the reasonable inferences permissibly drawn therefrom, in a light most favorable to Anderson, the party against whom the motion was directed. See Webb v. City of Chester, 813 F.2d 824, 828 (7th Cir.1987)