**Donald BOONE, Plaintiff,**

v.

**Richard J. ELROD, et al., Defendants.**

**No. 86 C 7929.**

United States District Court,
N.D. Illinois, E.D.

Feb. 27, 1989.

Donald Boone, Galesburg, Ill., pro se.

Daniel P. Slayden, Asst. State's Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiff Donald Boone brings this action under 42 U.S.C. § 1983 against three Cook County, Illinois, officials for allegedly violating his constitutional rights while he was a pretrial detainee in the Cook County jail. The defendants are Richard J. Elrod, Sheriff of Cook County, Phillip Hardiman, Executive Director of the Cook County Department of Corrections, and Charles Dunigan, Captain of Division 1 at the Cook County jail. Plaintiff sues all three defendants in their individual and official capacities. The defendants have moved for summary judgment. For the reasons set forth below, their motion is denied.

### FACTS

Plaintiff's affidavits and exhibits present a straightforward account of the events underlying this lawsuit. At some time prior to April, 1984, plaintiff was placed in a cell in Division 1, Tier G–2 of the Cook County jail to await trial on criminal charges against him. Plaintiff soon became frightened by the threats and physical violence of a number of gang members in his tier. Specifically, he was repeatedly forced to turn over his belongings to the gang members, and when he refused, he was beaten.

Plaintiff began writing letters to Cook County officials seeking a cell transfer. On April 23, 1984 he wrote a letter to Captain Dunigan informing him of the activities of the gang members and pleading for protection. On July 16, after the letter to the captain had gone unanswered, plaintiff wrote a letter to Director Hardiman, repeating his pleas for transfer and explaining that he was "in fear of losing his life." On August 13, having still received no response from anyone, plaintiff wrote to Sheriff Elrod, reiterating his fears and noting that he had written letters to Captain Dunigan and Director Hardiman but that no action had been taken. Finally, on September 11, plaintiff wrote another letter to Sheriff Elrod, noting that the threats

against him had increased and begging for some assistance.

On October 29, 1984 plaintiff was brutally beaten by a number of gang members in Division 1, Tier G–2. He was soon taken to Cermak Hospital, and after being treated for his injuries, was returned to the Cook County jail. At this point, he was placed on the safekeeping tier, Division 1, Tier F. Unfortunately, as a result of the beating, he was blinded in his left eye.

The defendants do not deny (for the purposes of this motion) that plaintiff suffered the threats and beatings prior to the October 29 incident. They do not deny that he wrote the letters he claims to have written to each of them. Nor do they deny that he was blinded by the October 29 beating. Instead, all three state that they do not recall receiving any of the letters or knowing of the threats against him, and then explain what they would have done had they learned of the problem.

Sheriff Elrod states that whenever he receives prisoner complaints he forwards them to Director Hardiman. He says that he does not manage the day-to-day operations of the Cook County jail, and therefore never transfers anyone within the jail.

Director Hardiman states that when he receives prisoner complaints, he forwards them to the appropriate division captain for proper action. Like Sheriff Elrod, he says that he does not manage the day-to-day operation of the jail and therefore does not transfer inmates to different cells.

Captain Dunigan states that when he receives prisoner complaints, he investigates them. He says that if he had received the letters regarding the threats and violence against plaintiff, he would have investigated them and, had they turned out to be true, transferred plaintiff to another cell. He attests, however, that he has no record of ever having investigated a complaint regarding threats or violence against plaintiff, and that accordingly no action was taken on plaintiff's behalf until the October 29 beating, at which time the captain had plaintiff transferred to a safer cell.

## DISCUSSION

As a preliminary matter, it is worth noting that the Fourteenth Amendment Due Process Clause, not the Eighth Amendment Cruel and Unusual Punishment Clause, governs this case. Throughout the entire time that plaintiff was incarcerated in the Cook County jail, he was awaiting trial on criminal charges—that is, he was a pretrial detainee. Since plaintiff had not been convicted of a crime, the Due Process Clause protected him from any punishment at all, not just from the cruel and unusual punishment forbidden by the Eighth Amendment. *Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977); *Anderson v. Gutschenritter*, 836 F.2d 346, 348–49 (7th Cir.1988).

This distinction might sound important, but in a case such as this one it is not. Although a convicted prisoner is entitled to be free only from cruel and unusual punishment, while a pretrial prisoner is protected from any punishment, courts have drawn no distinction in the standards they apply when analyzing whether prison officials have violated a prisoner's rights. Thus, when the courts say that "[t]he due process rights of a [pretrial detainee] are *at least* as great as the Eighth Amendment protections available to a convicted prisoner," *Anderson v. Gutschenritter*, 836 F.2d at 349 (emphasis added); *Colburn v. Upper Darby Tp.*, 838 F.2d 663, 668 (3d Cir. 1988), what they really appear to mean, at least in the context of the actions of prison officials, is that they are *precisely* as great. *See, e.g., Martin v. Tyson*, 845 F.2d 1451, 1457 (7th Cir.1988) ("An act or practice that violates the Eighth Amendment also violates the due process rights of pretrial detainees."). *But see Whitley v. Ambers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (declining to decide whether conduct of prison officials that did not violate the Eighth Amendment rights of convicted prisoners might nonetheless violate the due process rights of pretrial detainees).

In any case, the standard governing this case is clear:

The Due Process Clause "protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted." *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir.1984). To prevail on [his] Fourteenth Amendment claim, [plaintiff] ha[s] to prove that [defendants] acted deliberately or with callous indifference, evidenced by an actual intent to violate [plaintiff's] rights or reckless disregard for his rights.

*Anderson v. Gutschenritter*, 836 F.2d at 349; *Cambell v. Greer*, 831 F.2d 700, 702 (7th Cir.1987); *see also Goka v. Bobbit*, 862 F.2d 646, 649 (7th Cir.1988) (Eighth Amendment "impose[s] upon both federal and state correctional officers and officials the obligation to take reasonable steps to protect inmates from violence at the hands of other inmates.").

■ With this standard in mind, it is difficult to understand the defendants' motion for summary judgment. The defendants do not, and at this stage cannot, deny that plaintiff wrote them letters informing them of the serious threats and violence he was facing. If he did, and if the defendants ignored these pleas for help, then a jury could find that the defendants deliberately disregarded his right to be free from the attacks of fellow inmates.

Defendants Elrod and Hardiman, however, contend that a jury could not so find, because there is nothing to contradict their sworn testimony that if they received plaintiff's letters then they sent them on to an appropriate lower-level official. This argument might work had the letters been in a different chronological sequence. That is, had plaintiff written first to Elrod, then to Hardiman and then to Dunigan, the first two could legitimately maintain that, by delegating the letters down the chain of command, they were not callously disregarding plaintiff's plight.

But that is not what happened. Instead, plaintiff states (and his letters show) that he wrote first to Dunigan, then to Hardiman, and finally to Elrod, informing each that no one had yet responded to him. Under these circumstances, Hardiman and Elrod cannot hide behind their underlings. They had notice that nothing was being done, yet closed their eyes to this fact and allowed plaintiff to remain unprotected while the gang members continued to hound him. That is enough to hold these two supervisory officials liable under § 1983, and to hold the county liable as well.[1]

■ As for defendant Dunigan's motion, it is not only meritless but sanctionable as well. Dunigan concedes in his reply memorandum that plaintiff has created a genuine issue of fact as to whether or not his letters were sent and received. He insists that summary judgment is nonetheless mandated because Dunigan received, at most, only one letter informing him of the threats and violence, and this letter came six months before the final brutal beating.

Yet, this argument ignores plaintiff's submissions, as well as the sworn affidavits of the co-defendants. If the letters were sent and received, and if Elrod and Hardiman are telling the truth when they say that such letters would have been forwarded to Dunigan, then Dunigan might well have received at least four written letters notifying him of the threats and violence—the last dated just six weeks prior to the incident. Thus, even if the one letter in April created no more than a suspicion that plaintiff was in serious danger, a jury unquestionably could find that, but the time of the October 29 incident, Dunigan was deliberately ignoring threats to plaintiff's life.

In *Goka v. Bobbit*, the Seventh Circuit warned that summary judgment motions must not be pursued once a party learns

---

**1.** Because both Elrod and Hardiman were policy makers with respect to the Cook County jail, their actions are attributable to the county. *Anderson v. Gutschenritter*, 836 F.2d at 349; *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Thus, if the jury finds against either of them in their individual capacities, then it will have to find for the plaintiff on his official capacity claims. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).

"through the course of discovery, or otherwise ... that a material factual dispute exists." 862 F.2d at 650. The situation here differs from that case inasmuch as the moving defendants there knew of the material factual dispute prior to filing the motion, whereas Dunigan may not have learned of it until plaintiff had filed his affidavits and exhibits in opposition to the defendant's motion. But that difference does not help Dunigan, because he proceeded to file (and his attorney to sign) a reply memorandum insisting that summary judgment remained appropriate.

Accordingly, this court must not only deny his motion for summary judgment, but impose sanctions against him—actually, against his attorney—pursuant to Fed. R.Civ.P. 11. Fortunately for Dunigan, the fact that his violation did not occur until the reply brief stage means that no additional paperwork was necessitated by it, so the sanction will be a relatively small one of $100.

## CONCLUSION

The defendants' motion for summary judgment is denied. Rule 11 sanctions are imposed against defendant Dunigan's attorney in the amount of $100.