The ESTATE OF Max G. COLE, by its
Administratrix Lois PARDUE, and
Lois Pardue, Plaintiff,

v.

Jackie FROMM, Phill Spires, Dan Beck,
Katie Geier Easton, Clement Morris,
and Nancy Butler, all Individually, De-
fendants.

No. IP 93–1015–C–H/F.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 27, 1995.

Hamid R. Kashani, Indianapolis, IN, David A. Nowak, Columbus, IN, for plaintiff.

Robert J. Shula, Richard S. Pitts, Lowe Gray Steele & Hoffman, Indianapolis, IN, Burton M. Harris, Locke Reynolds Boyd & Weisell, Indianapolis, IN, for defendants.

## ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

The estate of Max G. Cole and Mr. Cole's mother brought this action against a doctor and several other staff at Wishard Memorial Hospital in Indianapolis. Cole was a pretrial detainee in the Marion County jail who was transferred to Wishard. He was classified as a "potential suicide," but not a "high risk suicide" patient. He managed to obtain a plastic bag and committed suicide by suffocation. The plaintiffs assert that the defendants acted under color of state law and were deliberately indifferent to the risk that Cole would commit suicide.

Currently pending before the court are two motions for summary judgment. One was filed by defendants Jackie Fromm, Phill Spires, Dan Beck, Katie Geier Easton, and Clement Morris collectively. The other was filed by the remaining defendant, Dr. Nancy

Butler.[1] The case raises a number of potential issues, but defendants seek summary judgment only on the grounds that there is no evidence that they were deliberately indifferent to Cole's medical needs and that they are entitled to qualified immunity. Plaintiffs have responded to both motions. (Defendants have also filed a motion to strike the affidavit of plaintiffs' expert, Dr. Larry M. Davis. Defendants' motion to strike will be denied in most respects.) The facts, taken in the light most favorable to plaintiffs, would not allow a jury to find that any defendant was deliberately indifferent to Cole's medical needs, including the risk that he would commit suicide by any means, including the plastic bag. The court will therefore grant summary judgment for all defendants and enter final judgment against plaintiffs.

## Undisputed Facts

The following facts are either undisputed or reflect the evidence in the light most favorable to plaintiffs. On July 1, 1991, Max Cole was a pretrial detainee being held at the Marion County Jail in Indianapolis, Indiana. On that day he was transferred from the jail to Wishard Memorial Hospital, reportedly because he had been hitting his head against a concrete wall at the jail and had been in a fight with another inmate. Cole was treated initially for abrasions to his face and forehead, and Dr. Alan Schmetzer, Chief of Psychiatry Services for Wishard, then assessed Cole's mental health status. Dr. Schmetzer noted that Cole denied any suicidal ideation and determined that neither his injuries nor his mental health status required admission to the hospital. Dr. Schmetzer thus recommended that Cole be returned to the jail with a follow-up examination to be conducted on July 3, 1991. After his examination of Cole, Dr. Schmetzer's shift ended and he left the hospital.

After Dr. Schmetzer's examination, but before Cole could be returned to jail, he became agitated, out of control, and tried to leave the emergency room. Cole was placed in restraints and Dr. Verkota Rao, a physician specializing in psychiatry, reevaluated him. Dr. Rao determined that Cole was experiencing symptoms of a drug-induced psychosis and he ordered Cole admitted to the hospital in the unit called "BU2." Dr. Rao placed Cole on potential assault, suicide, and elopement precautions at the time of his admission. He also prescribed Navane, an anti-psychotic drug, for Cole.

There are two levels of precautions under Wishard's policies relating to patients with possible suicidal tendencies. One level is known as "potential suicide precautions." The other level is known as "high risk suicide precautions." A doctor's order is required either to institute or to discontinue precautions at either level. The stated purpose of the "potential suicide" precautions level is to "provide ongoing assessment and intervention of patients who exhibit or verbalize suicidal ideations." Butler Dep., Pl. Ex. 11. Although the policy requires "close observation" by the caregiver, regular but not constant monitoring of the patient's behavior is appropriate. Id. Under the policy, the areas to which the patient has access are searched for contraband initially and thereafter "as needed." Id. Patients on potential suicide precautions may generally move freely about the BU2 unit and have access to the restrooms.

The purpose of the "high risk" precautions level is to "provide a safe and therapeutic environment for those patients who exhibit or verbalize serious suicidal intention." Butler Dep., Pl.Ex. 12. Under the high risk classification, there is continuous one-to-one monitoring of the patient. Id. Upon initiation of the precautions and during every shift thereafter, the patient's room, locker, and personal belongings are carefully searched for contraband. Id.

---

1. Plaintiffs' original complaint named twelve other health care providers working at Wishard. Six of these defendants, Jay Sutherland, Onvie Turner, Jeff Brackin, Glen Thompson, Joy Bennet Conway and S. Mahajam, were dismissed from the lawsuit by stipulation on December 7, 1993, and final judgment was entered with respect to them on December 20, 1993. The other six defendants, Bruce Miller, Stacy Evans, Larry Mitchell, Rita Montgomery, Monica Owens, and Allan Bryant, were dismissed by stipulation on January 14, 1994, and final judgment was entered with respect to them on February 10, 1994.

Defendant Dr. Nancy Butler is a board certified psychiatrist and Medical Director of In–Patient Psychiatry at Wishard. On July 2, the day following Cole's admission, Dr. Butler reviewed Cole's chart and conducted an independent mental status examination. She found that Cole was not contemplating suicide at that time and did not need a change in the "potential suicide" precautions assigned by Dr. Rao. In examining Cole, Dr. Butler found that he said he heard voices that told him, among other things, to hurt himself and others. Based on that statement and his agitation, Dr. Butler felt it proper to keep Cole on precautions. However, she did not believe that Cole was a high risk suicide patient at that time because he spoke logically and coherently, his hallucinations seemed mostly directed toward hurting others, and he disavowed a desire or need to act on his hallucinogenic suggestions. Moreover, Dr. Butler concurred with Dr. Schmetzer that Cole's behavior was likely caused by drug-induced psychosis as opposed to a personality disorder. She continued the Navane prescription and also prescribed Cogentin to combat the side effects of Navane.

The next day, July 3, 1991, Dr. Butler observed Cole and reviewed his chart. He had continued fluctuations in his behavior that Dr. Butler deemed consistent with a drug-induced psychosis. Dr. Butler's opinion at the time was that Cole did not need a change in his precautions because he did not exhibit signs suggesting he was contemplating suicide. Dr. Butler did not observe Cole after July 3.

On July 4, 1991, Dr. Schmetzer observed Cole. Late in the afternoon on July 4, the side effects from the medication began to subside. At 6:00 p.m., Cole was observed to be in his assigned room, asleep, and with no further signs of distress noted. Similar observations were made at 7:00 p.m., 8:00 p.m., and 9:00 p.m. At 9:45, Cole was observed to be alert with no complaints of medication side effects. At 9:55 p.m., Cole came to the dayroom in the unit and requested a cigarette from defendant Fromm, the nurse on duty. Fromm gave Cole a cigarette and recalls that he told her that he felt better. Cole did not appear to Fromm to be agitated

or depressed, and he made no mention at that time of harming himself.

About 25 minutes later, at approximately 10:22 p.m. on July 4, Cole was found to have committed suicide in his room. Tana Wurster, another nurse on duty, found Cole with a plastic bag over his head. She removed the bag, called to him and tried to shake him, but was unable to revive him. She called for help and ordered defendants Spires and Morris to carry Cole to the men's restroom so that he could be placed in the shower. Wurster testified that she thought Cole might be holding his breath because she had spoken to him not long before she found him. Fromm heard the commotion in Cole's room from the attempt to get him to the shower and investigated. When Fromm arrived, she instructed Spires and Morris to put Cole down, checked for a pulse, determined that he was not breathing, and initiated CPR. Defendant Easton, also on the scene by that time, returned to the nurses station and called for the "code team," or emergency help. The code team arrived and took over CPR efforts. From that point no member of the BU2 staff had any further involvement with Cole's care. Cole was pronounced dead at approximately 11:00 p.m.

The defendants all had varying degrees of contact with Cole. Jackie Fromm is a licensed practical nurse who had worked at Wishard in that capacity for approximately five years prior to Cole's admission. During the four days of Cole's hospitalization, Nurse Fromm was never assigned to his care. However, she interacted with Cole in the course of her regular nursing duties. She testified that in the course of that interaction, she never observed any behavior that would suggest to her that there was need for a change in Cole's precautions. She documented his denial of suicidal tendencies on her nursing observation chart.

Katie Geier Easton was a graduate nurse at the time of Cole's hospitalization, which means she had just completed her bachelor's degree in nursing but had not yet taken her Registered Nursing licensure examination. She had been employed at Wishard for six weeks prior to Cole's death. Easton was never responsible for Cole's health care.

Her only contact with Cole was during the course of hall checks she made for all patients. During those hall checks, Easton observed Cole once on July 2, once on July 3, and four times on July 4. She did not observe on any of these occasions any behavior that suggested to her that Cole intended to harm himself.

Daniel Beck was a Nursing Mental Health Clinician at the time of Cole's hospitalization. Beck did not work in the BU2 unit from July 1 through July 3, but he did work in the unit on the evening shift of July 4. Beck was not assigned to Cole's care but performed two hall checks where he observed Cole. He did not observe on those two occasions any behavior that suggested Cole had suicidal tendencies.

Clement Morris was also a Nursing Mental Health Clinician at the time of Cole's hospitalization. He worked evening shifts in the unit on July 1, 3, and 4. Morris was never assigned to Cole's care, but he observed Cole on several occasions during his shifts. He never observed any behavior from Cole that suggested he had suicidal tendencies.

Phill Spires was also a Nursing Mental Health Clinician at the time of Cole's hospitalization. Spires worked the day shifts on July 2 and July 4 but had no involvement with Cole's care during those shifts. Spires was assigned to Cole's care during the evening shift of July 4. The assignment meant that Cole could go to Spires in the event he needed food, clothing, or someone to talk to. Spires also never observed behavior that suggested to him that Cole had suicidal tendencies.

Defendants have identified the plastic bag Cole used to commit suicide as being similar to those used as liners for the soiled linen hampers in the two restrooms in the BU2 unit. (There is a third hamper with a plastic liner in the utility room, but that room is kept locked and inaccessible to patients.) The plastic liners are used pursuant to a Wishard policy that is designed to comply with Indiana State Board of Health regulations governing communicable disease control policies.

None of the nursing defendants (Fromm, Spires, Beck, Easton, and Morris) had any input into the creation or development of Wishard's infectious disease control policy. Similarly, none of the nursing defendants had input into the creation or development of Wishard's suicide risk classification policy. Dr. Butler approved the suicide risk classification policy for implementation. The nursing defendants knew that plastic bags were used in the restrooms of the BU2 unit. Dr. Butler testified she did not have such knowledge, but, as plaintiffs point out, a jury could reasonably find that she did know the bags were there. There is no direct evidence that any defendant perceived the bags to be a danger to patients. No one had ever suggested to any of the nursing defendants that the plastic sanitary liners posed a danger to Cole or any other patient. In fact, there is no evidence that any person who had ever worked in the BU2 unit, visited it, or inspected it had ever recognized that the bags posed a risk to patients, let alone that any such person called that risk to the attention of anyone else. Before Cole's suicide, no BU2 unit patient, in any of the defendants' memories, had ever tried to use a plastic bag to harm himself or herself. None of the defendants witnessed Cole obtaining the plastic bag or knew that he intended to obtain it.

### Defendants' Motion to Strike

Defendants object to the affidavit of Dr. Larry M. Davis, plaintiffs' expert. In his affidavit, Dr. Davis, a board certified psychiatrist, provides opinions on the danger of plastic bags, the general knowledge of that danger to mental health workers, and the duty of mental health workers, such as defendants here, to object to plastic bags being accessible to patients like Cole, or to remove them from the unit. Defendants object to Dr. Davis' affidavit on several different grounds.

First, defendants say that the entire affidavit is inadmissible because it is not based on the affiant's personal knowledge as required by Fed.R.Civ.P. 56(e). Dr. Davis' affidavit does not use the words "personal knowledge." However, Dr. Davis is an expert witness, not a fact witness. Under the Federal Rules of Evidence, an expert witness is not required to have personal knowledge of

the underlying facts in the lawsuit. An expert may testify to his or her specialized knowledge that will assist the trier of fact. See Fed.R.Evid. 702, 703. In making his affidavit, Dr. Davis did what was required of an expert: he affirmed the truth of his statements, he stated his qualifications, he stated that he had reviewed certain materials to render an expert opinion, and he stated his opinion. Defendants' objection to the affidavit as a whole is overruled.

Next, defendants object to what they say are Dr. Davis' impermissible attributions of subjective knowledge to them. Specifically, in his affidavit, Dr. Davis, discussing the danger posed by the plastic bags, stated:

> The danger presented by the plastic bags in the trash can and the laundry hamper on the BU2 unit were [sic] obvious and significant, and constituted a substantial risk of serious harm, and significant risk of death, to a "potential suicide" patient such as Mr. Cole. *This danger was obvious to Dr. Butler, Ms. Fromm, Mr. Spires, Ms. Easton, Mr. Beck, and Mr. Morris.*

Davis Affidavit, ¶ 4 (emphasis added).

■ The first sentence of Paragraph 4 is admissible because it is a statement relevant to the medical standard of care Dr. Davis asserts was applicable to and breached by the defendants. His reference to the danger being "obvious" in this sentence seems to be an assertion of what *should* have been noticed. There are similar statements elsewhere in the affidavit. However, the second sentence of Paragraph 4 seems to go a step farther and to instruct the trier of fact what was subjectively "obvious" to these defendants. As will be seen below, the difference between what should have been obvious to the defendants (at least according to Dr. Davis) and what was in fact known to them is a decisive difference. Dr. Davis has no personal knowledge concerning, and may not render an opinion on, the subjective knowledge of the defendants, so the second sentence of Paragraph 4 will be stricken.

■ Finally, defendants assert that Dr. Davis' affidavit contains inadmissible legal conclusions. Defendants attack Dr. Davis' statements concerning defendants' duties mentioned above. Specifically, defendants object to Dr. Davis' assertion in Paragraph 8 of the affidavit that they had "a duty to either object to the availability of plastic bags on the unit and demand their removal or to increase their monitoring level of Cole." Citing cases discussing the often hazardous exercise of distinguishing between permissible expert opinion on the ultimate factual issue and impermissible legal conclusions, defendants say that Dr. Davis' statement in Paragraph 8 is "unfounded." A review of the affidavit, however, shows that he "founded" his conclusion on the following facts: (1) the consensus among psychiatrists and mental health care workers is that plastic bags are dangerous, see ¶ 1; (2) there have been campaigns in the past to educate the public about the dangers of plastic bags, see ¶ 2; (3) warning labels now appear on plastic bags as a result of those campaigns, see ¶ 2; (4) plastic bags presented a threat to Cole as a patient on potential suicide status, see ¶ 3; and (5) physicians, nurses, and mental health care workers have a duty to inspect the unit for dangerous items, see ¶¶ 5, 6. Paragraph 8 does not contain statements on the "ultimate fact" of a violation of the *constitutional* standard at issue here. It contains statements that together comprise Dr. Davis' opinion on the appropriate medical standard of care defendants owed to Cole. While Dr. Davis' opinions on that standard and on the defendants' purported breach are not dispositive, as discussed below, they are relevant to the extent they may be used as circumstantial evidence of what defendants knew of the risks Cole faced. See *Farmer v. Brennan,* 511 U.S. 825, –––––––, 114 S.Ct. 1970, 1981–82, 128 L.Ed.2d 811 (1994). Defendants' motion to strike is therefore overruled except as to the second sentence of Paragraph 4.[2]

---

2. Defendants did not object specifically to paragraph 9 of Dr. Davis' affidavit, which purports to inform the court that there is no evidence that the defendants objected to Cole's classification, that there is no evidence that defendants de-

manded Cole's removal or transfer from the unit, and that there is no evidence that defendants objected to the availability of plastic bags in the unit. This seems to be more argument than evidence, but the court will treat it as an expla-

## Motion for Summary Judgment

The facts in this case are not disputed. At issue are the permissible inferences which may reasonably be drawn from those undisputed facts and how those inferences measure up against the standard of liability for these defendants. Plaintiffs' sole claim is that defendants are liable under 42 U.S.C. § 1983 for violating Max Cole's due process rights under the Fourteenth Amendment by being deliberately indifferent to the risk that he would commit suicide while in their care. Plaintiffs' theory is that the defendants knew Cole was a suicide risk; they knew plastic bags in the unit were accessible to Cole; they knew the bags presented a serious risk of harm to Cole; and they took no steps either to object to the availability of the plastic bags, to transfer Cole out of the BU2 unit, or to increase their monitoring of him. Thus, say plaintiffs, a jury may infer that the defendants knowingly or recklessly disregarded a substantial risk of serious harm to Cole.

■ The first question is the relevant standard of liability for defendants here. Convicted prisoners are protected by the Eighth Amendment's prohibition on "cruel and unusual punishment," which protects prisoners from "deliberate indifference" to their serious medical needs. *E.g., Farmer v. Brennan*, 511 U.S. 825, ——— ———, 114 S.Ct. 1970, 1979–80, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). *Farmer* made it clear that the "deliberate indifference" standard under the Eighth Amendment must focus on the defendant's subjective state of mind, not on an objective standard of what the defendant should have known. The Court said that (1) there is no liability "unless the official knows of and disregards an excessive risk to inmate health or safety"; (2) "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"; and (3) "[a]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot

nation of Dr. Davis' opinion and therefore will

under our cases be condemned as the infliction of punishment." 511 U.S. at ———, 114 S.Ct. at 1979.

*Farmer* further explained the deliberate indifference standard by noting the distinction between being "reckless" in the criminal as opposed to the civil sense. In civil cases, recklessness usually may be found if a person under a legal duty acts or fails to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." 511 U.S. at ———, 114 S.Ct. at 1978. "The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." *Id.* at ——— ———, 114 S.Ct. at 1978–79. This critical difference should not be exaggerated, however, for similar evidence may be considered to establish either level of recklessness. In *Farmer* the Supreme Court explained that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." 511 U.S. at ———, 114 S.Ct. at 1981 (citations omitted). The Court emphasized, however, that a plaintiff may not prove deliberate indifference by proving that a reasonable person would have known of the risk or that the defendant should have known of the risk. 511 U.S. at ——— n. 8, 114 S.Ct. at 1982 n. 8.

■ *Farmer* does not apply directly here because the Eighth Amendment does not apply to "pretrial detainees," those persons under detention who have not been convicted and incarcerated; pretrial detainees are not subject to punishment that the Eighth Amendment regulates. *Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir.1992). For those detained by a state, the protection afforded pretrial detainees from harm by government officials is found in the due process clause of the Fourteenth Amendment. *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988) (citing *Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40, 97 S.Ct.

not strike Paragraph 9.

1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977)). The Supreme Court has not definitively articulated the standard of § 1983 liability for government officials being sued by pretrial detainees under the due process clause. However, the Court has made clear that it is higher than simple negligence. See *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 333–34, 106 S.Ct. 662, 666–67, 88 L.Ed.2d 662 (1986).

The Seventh Circuit has held that the due process clause standard for § 1983 liability for claims brought by pretrial detainees is "wilful neglect." *Hall v. Ryan*, 957 F.2d at 405. The court said it equated that standard with deliberate indifference, and that it was the appropriate standard in cases where the pretrial detainee was a suicide risk. *Id.* The Seventh Circuit has also said that "recklessness" may describe the standard under the due process clause as long as it is clear that it is a *subjective* knowledge that must be inferred from the risk posed. *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir.1988) (*en banc*). That holding is consistent with the *Farmer* concept of "deliberate indifference" for claims by prisoners under the Eighth Amendment. *Farmer*, 511 U.S. at ————————, 114 S.Ct. at 1979–80. The Seventh Circuit has made clear that an official's "gross negligence" does not render him liable under the due process clause. *Archie*, 847 F.2d at 1219. Compare *Farmer*, 511 U.S. at ———— n. 4, 114 S.Ct. at 1978 n. 4 ("gross negligence" is a nebulous term typically meaning something little different than civil law recklessness), with *Daniels v. Williams*, 474 U.S. at 334 n. 3, 106 S.Ct. at 666–67 n. 3 (expressly declining to decide whether some-

thing less than intentional conduct, *e.g.,* "gross negligence," is enough to trigger protections of due process clause where allegations there amounted to claim of simple negligence). The Seventh Circuit's standard of "wilful neglect," which requires a finding of subjective knowledge of the risk, appears to be identical to the *Farmer* standard of deliberate indifference. That standard governs this case.

In attempting to meet the deliberate indifference standard here, plaintiffs focus on the defendants' failure to prevent Cole from obtaining the plastic bag that he used to commit suicide. The court believes the analysis must begin at a somewhat broader level. The first question is the propriety of the evaluation of Cole by Dr. Butler (consistent with the evaluations of Dr. Schmetzer and Dr. Rao) placing him under the lower of the two levels of suicide precautions. Second, if Cole was reasonably classified at the lower level of suicide risk, the question is whether any of the defendants was deliberately indifferent to the risk that he would commit suicide.[3]

Plaintiffs have not pointed to any information that was available to Dr. Butler that should have convinced her to classify Cole as a "high risk" patient. Plaintiffs put forth no evidence that Dr. Butler misdiagnosed Cole's condition initially or that his later behavior ever warranted an upgrading of his precautions. Thus, it would be doubtful on this record whether plaintiffs could even avoid summary judgment under a negligence standard on this issue, let alone show that Dr. Butler was deliberately indifferent to Cole's proper classification.[4] There is also no evi-

3. The cases in this area suggest that the risk must be a "serious" one before the duty on which the deliberate indifference standard is based arises. See generally *Estelle v. Gamble*, 429 U.S. at 105–06, 97 S.Ct. at 291–92; accord, *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983) (there must be "strong likelihood" as opposed to "mere possibility" that inmate will attempt suicide in particular case to render official liable under deliberate indifference standard); *Viero v. Bufano*, 901 F.Supp. 1387, 1392–94 (N.D.Ill.1995) (same). Whatever the precise content of a "serious risk," there is every indication here that all the defendants were working under the assumption that there was some risk Mr. Cole could try to commit suicide.

4. See *Brownlow v. Chavez*, 871 F.Supp. 1061, 1063 (S.D.Ind.1994) (neither "[m]edical malpractice [nor] inadvertent failure to provide adequate medical care ... amount[s] to a constitutional violation"); *Bell v. Stigers*, 937 F.2d 1340, 1343–44 (8th Cir.1991) (discussing several prison suicide cases involving question of the knowledge of the risk required for liability). On the other hand, defendants have provided significant evidence that they took reasonable precautions to protect Cole. See *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir.1983) (lack of knowledge of extent of suicidal tendencies combined with reasonable precautions preclude finding of deliberate indifference). See also *Tit-*

dence that the nursing defendants had any input into the risk classification (that required a doctor's order), or that any of them ever observed any behavior or circumstances that should have led them to ask a doctor to re-evaluate Cole for the "high risk" level of precautions.

Thus, neither Dr. Butler nor any other defendant can be held liable for Cole's classification at the lower of the two levels of suicide precaution. This conclusion is important because plaintiffs' arguments seem to proceed from the premise that, because Cole presented some risk of suicide, defendants were obligated to take *any* available measures to prevent his suicide. It is true that Cole probably would not have been able to commit suicide at Wishard if he had been classified as "high risk" and subjected to continuous one-on-one monitoring. However, the Constitution does not require those who care for prisoners or pretrial detainees to guarantee the safety of their charges even against known risks. In this case physicians reasonably classified Cole as a "potential suicide" and took steps that were intended to prevent his suicide.

The fact that more stringent measures probably would have been successful in protecting Cole from suicide does not mean that any defendant was deliberately indifferent to his needs. The measures actually taken to protect him were significant. They included searches and frequent observation and evaluation. More intrusive, more restrictive, and more expensive measures could have been taken. But there is no evidence that the classification of Cole at the lower level of risk was even unreasonable, let alone an act of deliberate indifference.

In addition, courts need to be careful before they impose liability on government officials for not imposing more stringent restrictions on a prisoner or pretrial detainee. Prison officials and health care workers treating patients who are under detention are also under constitutional pressure not to take too much liberty away from their

charges. The Eighth Amendment would intervene if prisoners were automatically strait-jacketed at the slightest hint of odd behavior. As Chief Judge Posner has written for the Seventh Circuit, "Liability is a pretty blunt instrument for shaping behavior, so when there is liability for doing too little of a thing, the law should hesitate before imposing liability for doing too much of it." *Charter Oak Fire Ins. Co. v. Color Converting Industries Co.*, 45 F.3d 1170, 1175 (7th Cir.1995) (citing *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 203, 109 S.Ct. 998, 1007, 103 L.Ed.2d 249 (1989) and *United Steelworkers of America v. Weber*, 443 U.S. 193, 210, 99 S.Ct. 2721, 2730–31, 61 L.Ed.2d 480 (1979)). The situation here is the mirror image. Where officials risk some liability by restraining pretrial detainees too severely, they must be allowed some latitude to impose less severe restraints. They are entitled to make professional judgments about the extent of the risk in a particular case. And that latitude must include the latitude to make judgments that turn out, with the benefit of hindsight, to have been incorrect. Moreover, the evidence in this case shows that the mental health department at Wishard has had 800 to 1000 patients per year with varying conditions that may make them risks to themselves or to others. Where both personal liberty is at stake and scarce resources must be allocated, liability rules (including those developed under the Constitution) cannot be imposed so as to require essentially every patient who presents with any degree of risk of suicide to be classified as though he or she were a high risk, just to be on the safe side.

These points do not completely decide this case, however. The analysis now turns to the role of the plastic bags in Cole's death. Plaintiffs have argued that the nursing defendants should have objected to the use of the plastic bags in the BU2 unit restrooms, should have attempted to upgrade his precautionary status, or should have monitored him more closely. The evidence shows that

*tle v. Mahan*, 566 N.E.2d 1064, 1071 (Ind.App. 1991) (deputy sheriff's observation of pretrial detainee on suicide precautions 42 times in 48 hours was not enough to protect inmate, but

failure was negligent, not result of deliberate indifference), *vacated in part on other grounds*, 582 N.E.2d 796, 802 (Ind.1991).

the nursing defendants knew that the plastic bags were used as hamper liners in the restrooms. Dr. Butler testified that she did not know about the plastic hamper liners, though plaintiffs suggest a jury could find otherwise. The court agrees that a jury could reasonably decide not to believe Dr. Butler on this point. Thus, at least for purposes of the motions for summary judgment, the defendants were aware of at least one fact that is indispensable to plaintiffs' claim.

 Under the deliberate indifference standard, however, none of the defendants can be liable unless a plaintiff can show that an individual defendant was aware of facts from which the inference of a serious risk of harm was possible and that the defendant actually made the inference. *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1979. Direct evidence of a defendant's thought process in this context is likely to be rare, and the *Farmer* Court held that circumstantial evidence may be used to demonstrate the defendant's knowledge. See 511 U.S. at ——, 114 S.Ct. at 1981 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). If the plaintiff offers evidence sufficient to show that a risk was so obvious that it would allow a jury to find that the defendant official actually knew of the risk of harm when he or she acted to cause (or failed to act to prevent) the harm, then the jury may find that the defendant actually made the inference that such harm was likely to accrue, and therefore that the defendant was deliberately indifferent.

The evidence relevant to the defendants' knowledge of the risk of harm to Cole consists of (1) the evidence that all the nursing defendants knew of the existence of the plastic bags (and that Dr. Butler arguably knew of them), and (2) the opinions of plaintiff's expert, Dr. Davis, (a) that the use of the plastic bags in the BU2 unit created a serious risk of substantial harm to patients like Cole, and (b) that the defendants did not adhere to a professional standard of medical care by failing to remove Cole, object to the presence of the bags, or monitor him more closely. In short, Dr. Davis opines that the danger was obvious, and thus should have been obvious to the defendants. Plaintiffs argue that *Farmer* would allow a jury in this case to infer reasonably that the risk posed by the plastic bags in the restroom laundry hampers was so obvious that the defendants *must* have known about it and then chose to do nothing about it. *Farmer* clearly allows a plaintiff to prove knowledge from circumstantial evidence that the risk was obvious. 511 U.S. at ——, 114 S.Ct. at 1981.

 In this case, however, the evidence might be sufficient to allow a jury to find that the defendants should have recognized the risk, but it does not reasonably permit an inference that any of these defendants was *actually* aware of the risk. *Farmer* holds that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at ——, 114 S.Ct. at 1979. This is not a case where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, [nor in which] the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it...." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1981. To the contrary, the undisputed evidence here shows (a) that no patient had previously tried to commit suicide by using a plastic bag, (b) that no staff member of Wishard had ever recognized the risk posed by the bags, let alone told anyone else about the risk, (c) that no visitor, inspector, or anyone else had recognized the risk before Cole committed suicide, and (d) that no defendant had been advised of the risk by anyone else. Where there is no evidence that anyone had recognized the risk before, Dr. Davis' opinion that the risk should have been obvious to the defendants would not allow a jury to infer reasonably that any of these defendants *actually* recognized the risk and chose to do nothing about it.

### Conclusion

Plaintiffs put forth no evidence that, based on the information known to defendants at the time, defendants misdiagnosed Cole's condition or that his earlier behavior war-

ranted an upgrading of his precautions, let alone that any defendant knew of and was indifferent to this alleged misdiagnosis. Further, there is no evidence from which a jury could reasonably find that any defendant was actually aware of the serious risk of harm to Cole posed by the plastic hamper liners and then deliberately failed to act. Taking the evidence in the light most favorable to plaintiffs, there is no showing of deliberate indifference. The motions for summary judgment are therefore GRANTED. The court will enter final judgment in favor of defendants.